[Crim. No. 3465. Fifth Dist. Mar. 30, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
LUTHER DICKSON, Defendant and Appellant.

410

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

■■■■■■■■■■

Evelle J. Younger and George Deukmejian, Attorneys General. Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Ramon M. de la Guardia and Thomas Yanger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRANSON, Acting P. J.**—Appellant stands convicted following a plea of guilty to the manufacture of phencyclidine (PCP) in violation of Health and Safety Code section 11379. His plea was entered after the superior court denied his motion to suppress evidence seized by police officers without a search warrant.

The pertinent facts which led to the seizure of the evidence are as follows: In February 1977, appellant was employed as an assistant professor of chemistry at the Bakersfield campus of California State University. Appellant was assigned the use of a small laboratory in the university science building. The evidence which appellant sought to suppress (samples of PCP and materials used to manufacture that drug) was seized from that laboratory.

Sometime prior to February 14, 1977, Officer Middleton of the Bakersfield Police Department and Agent Johnson of the Federal Drug Enforcement Administration (FDEA) learned from a reliable informant that a black chemistry professor at California State University, Bakersfield, was manufacturing and selling PCP. Through further investigation, Officer Middleton determined that appellant was the only person at the college fitting that description.

. During the evening of February 17, at Officer Middleton's request, a campus policeman (McInness) unlocked the laboratory used by appellant. Middleton and McInness entered and inspected the lab. The officers observed a quart-sized beaker containing a wet green leafy substance with the odor of mint, a plastic bag containing what appeared to be dried mint leaves, and a quart bottle containing a brown liquid. These items were in a large metal storage cabinet located in the middle of the room. Officer Middleton testified that when he observed the evidence of PCP the cabinet doors were unlocked and open. Appellant testified that the cabinet was left closed and locked.

■■■■■

Officer Middleton knew that PCP is usually spread on mint leaves when sold illegally; he therefore seized samples of the dried leaves, the saturated leaves, and the brown liquid in the quart container with which the leaves had apparently been soaked. All three samples proved to contain PCP.

About a week later, on the evening of February 24, Agent Johnson (FDEA) and Officer Vegas of the Bakersfield police kept appellant's lab under surveillance. From about 7:30 to 11 p.m., appellant was observed working in the lab with the door open. A load of ice was delivered to the lab at about 9:30 p.m. Officers then went to the roof of the building and detected the odor of ether from the exhaust vent of the lab in which appellant was working. It was stipulated that Agent Johnson and Detective Vegas were aware that ice and ether are necessary ingredients of PCP. The officers then posed as janitors and went to the lab where they engaged appellant in conversation. At appellant's request, the officers assisted him in adjusting a chemical apparatus which subsequently proved to contain PCP. At about 11 p.m., appellant left the building. Before leaving, he asked the officers to watch the apparatus and turn it off if a certain reaction occurred. After appellant left, several other officers appeared, examined the apparatus, and took pictures.

The next morning, February 25, 1977, appellant returned to the lab. At that time, he was arrested and additional evidence was seized. The ingredients appellant was using could have yielded between $5,000 and $7,000 worth of PCP at its street value.

The following evidence pertains to whether appellant had a reasonable expectation of privacy as to the lab and the metal cabinet located therein. The laboratory is a small enclosed room approximately eight feet wide and ten feet long. The top half of the lab door contains a window. Most of the interior of the lab can be seen through that window, except for an area hidden from view by the large metal cabinet which stands in the middle of the room. The doors of the metal cabinet face away from the lab entrance; one cannot see into the cabinet from outside the lab.

The door to the lab is equipped with a lock, to which other science professors, lab technicians, janitors, and campus police officers have a key.[1] Appellant testified that other professors and students might enter the lab when he was not there to take a chemical or equipment, but the professional etiquette at the university was to generally obtain permission .

[1] The campus police maintain the key repository system for the entire campus.

before removing materials from a professor's lab. Appellant said that he would only take a chemical that was out in the open, but that he would not take anything from another professor's cabinet. Appellant also stated that faculty members would not touch each other's experiments unless there was imminent danger of a catastrophe. He stated that professors and technicians would not take samples from an experiment.

The janitors, who also had keys to the labs, would enter nightly to sweep the floor and empty the trash, but appellant stated they would not open cabinets or take samples from them.

Campus security officers and fire marshall safety officers entered the labs periodically to conduct safety inspections; the officers check to be sure that dangerous chemicals are properly stored. The campus police officers also had a key to the metal cabinet. The last such inspection of appellant's lab prior to his arrest occurred in October or November of 1976. There was also a safety inspection of the exhaust hood in appellant's lab in January 1977.

Although appellant recognized that janitors, campus police, fire marshalls, technical assistants, and other professors might enter the lab for the purposes discussed above, appellant testified that he believed he was the only person using the laboratory for scientific work in February of 1977.

The door to the laboratory was usually kept open for safety reasons when appellant was working. Appellant was aware that even when the door was closed, people could look in through the window and see his work. However, he stated that the only things visible in his lab would be equipment that did not appear any different from that found in any of the other laboratories.

## DISCUSSION

■ Appellant obviously believed that he had isolated himself in an atmosphere of total privacy insofar as his PCP activity; hence, the critical issue is whether his expectation of privacy was objectively reasonable. (*North* v. *Superior Court* (1972) 8 Cal.3d 301, 308 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155].) In deciding this issue, we must look to the totality of the facts and circumstances (*id.,* at pp. 308-312). The following facts show that a reasonable person standing in appellant's shoes and knowing what appellant knew could not have anticipated any degree of

privacy in the laboratory room itself. When appellant locked the door to the lab, he knew that other science professors, lab technicians, janitors and the campus police had keys to the lab and that they might enter at any time and for various purposes. Of particular importance is appellant's knowledge that the campus police and safety officers could enter periodically to conduct safety inspections and determine if chemicals were properly stored. We also judicially note a common fact, which appellant as a highly educated, reasonably intelligent person should have known, that the campus police are "peace officers" charged with the responsibility of investigating and preventing criminal activity which may occur on the campus. (Ed. Code, § 89560.) As a peace officer, a campus policeman is authorized to make lawful arrests for crimes committed or which there is probable cause to believe have been committed either in his presence or on the campus to which he is assigned. (Pen. Code, § 830.2, subd. (e)(2); Ed. Code, § 89560.) Furthermore, upon request, a campus police officer may render such assistance to other peace officers as is appropriate under the circumstances (Pen. Code, § 830.2, subd. (e)(3)). Thus, the entry into the lab by Campus Police Officer McInness and Bakersfield Police Officer Middleton on the night of February 17 was in furtherance of the duties of Officer McInness—a reasonable and prompt investigation of a report that appellant was manufacturing PCP in the school laboratory.

We are fully aware of the principle that the Fourth Amendment protects people not places; although a defendant may be held to anticipate the presence of third persons within his sphere of privacy, he generally need not anticipate the presence of searching police officers. (See, e.g., *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507] involving a reasonable expectation of privacy in a public phone booth; *Stoner* v. *California* (1964) 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889]—hotel guest should not reasonably anticipate police entry into his room even though maids, janitors and repairmen might enter; *People* v. *Triggs* (1973) 8 Cal.3d 884 [106 Cal.Rptr. 408, 506 P.2d 232]—a reasonable expectation of privacy in public restrooms; *People* v. *Krivda* (1971) 5 Cal.3d 357 [96 Cal.Rptr. 62, 486 P.2d 1262] (disapproved on other grounds in *Madril* v. *Superior Court* (1975) 15 Cal.3d 73, 77 [123 Cal.Rptr. 465, 539 P.2d 33] and *People* v. *Kaanehe* (1977) 19 Cal.3d 1, 11 [136 Cal.Rptr. 409, 559 P.2d 1028])—reasonable expectation of privacy in trash barrels even though not unforeseen that trash collectors, vagrants or children might rummage through the barrels; see also *Gillard* v. *Schmidt* (3d Cir. 1978) 579 F.2d 825 holding that guidance counselor in public school charged with maintaining sensitive student records, in absence of

custom or regulation to the contrary, enjoys a reasonable expectation of privacy in his school desk.) These cases, however, are distinguishable in that a reasonable person under the circumstances would not have anticipated a purposeful police intrusion into his zone of privacy. In the present case, we have a highly educated college professor using a school laboratory with explicit knowledge that *the police* as well as many other persons had ready access to the lab at all hours of the day or night. Manifestly, he could not reasonably expect any degree of Fourth Amendment privacy in the laboratory under these circumstances.

Having determined that appellant's expectation of privacy in his lab was not objectively reasonable insofar as the police entry on February 17, it necessarily follows that the seizure of the PCP evidence by Officer Middleton from the open metal storage cabinet was lawful.[2] Seizure of evidence in plain sight by an officer in a place where he has a right to be is permissible. (*Dillon* v. *Superior Court* (1972) 7 Cal.3d 305, 310 [102 Cal.Rptr. 161, 497 P.2d 505].)

Our analysis as to the absence of any objectively reasonable expectation of privacy to the laboratory applies with equal force to the officers' entry on February 24th disguised as janitors. (At appellant's request, the officers assisted him in adjusting a chemical apparatus in which he was making PCP. Before leaving appellant asked the officers to watch the apparatus and to turn it off if a certain reaction occurred.) That the officers did not disclose their true identity does not create a reasonable expectation of privacy where none existed before. *Katz, supra,* and its progeny do not require a review of the nature of the police entry (whether by key or by disguise) absent a reasonable expectation of privacy by the defendant in the area of the intrusion. Furthermore, the officers had probable cause to arrest appellant for manufacturing PCP in the lab when they entered the lab on February 24th. They knew that appellant was the only person who met the description given by the informant; they already had discovered and seized evidence of PCP in the lab on February 17; they had observed ice and ether being used in the lab earlier in the evening of February 24; thus, even assuming their entry

[2]We are bound by the trial court's resolution of the conflict in the evidence as to whether the doors to the metal cabinet were open and the PCP contents of the cabinet visible to the officers when they entered the lab on February 17th. Officer Middleton testified that when he and Sergeant McInness entered the lab it was a "cursory type walk through" and when they observed the evidence of PCP inside the metal cabinet "the cabinet doors were open." Officer Middleton also testified that the doors to the cabinet were open when they entered the lab.

of the lab disguised as janitors was somehow improper, it was of no consequence to appellant's Fourth Amendment rights.

The judgment is affirmed.

Hopper, J., and Best, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 24, 1979.

---

*Assigned by the Chairperson of the Judicial Council.