[No. D044120. Fourth Dist., Div. One. June 21, 2005.]

JOHN GREENWOOD BRIERTON, Plaintiff and Appellant, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Respondent.

502

COUNSEL

John Greenwood Brierton, in pro. per.; Charleston, Revich & Chamberlin and Chad B. Wootton for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Jacob A. Appelsmith, Assistant Attorney General, Chris A. Knudsen and John J. Spangler, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**AARON, J.—**

## I.

### INTRODUCTION

Appellant John Greenwood Brierton appeals from a judgment in the trial court denying his petition for a writ of mandate. The trial court denied Brierton's request that the court issue a writ of mandate to prohibit the Department of Motor Vehicles (DMV) from suspending his driver's license as a result of his arrest for driving under the influence of alcohol in violation of Vehicle Code section 23152.

Brierton contends that the DMV may not suspend his license because the arresting officer did not have reasonable suspicion to stop him on the night of July 30, 2003. Brierton also argues that the arresting officer did not have the authority to stop or arrest Brierton on a City of San Diego (City) street because (a) the stop and arrest took place outside of the territorial jurisdiction granted to campus police officers by state statutes and/or (b) the state statutes granting campus police officers authority to enforce laws beyond campus

boundaries unconstitutionally conflict with the enforcement powers of a charter city. We disagree with Brierton's contentions and affirm the trial court's denial of his petition for a writ of mandate.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

On July 30, 2003, at 1:31 a.m., San Diego State University (SDSU) Police Officer D. Miller observed Brierton accelerate and lose traction for "approximately 20–25 feet" while driving in the 5100 block of College Avenue. Officer Miller stopped Brierton to investigate a possible violation of Vehicle Code section 23109, subdivision (c) (exhibition of speed).[1]

After approaching Brierton and making contact, Officer Miller observed that Brierton's eyes were bloodshot and watery, and that he had gaze nystagmus.[2] Officer Miller detected an odor of alcohol, and observed that Brierton's gait was unsteady and his speech was slurred—all of which Miller testified constitute objective signs of intoxication. Thereafter, Officer Miller arrested Brierton for driving under the influence of alcohol.

Brierton submitted to a breathalyzer test and provided two samples. The first sample, taken at 2:55 a.m., registered a blood-alcohol concentration of 0.15 percent. The second sample, taken two minutes later, also registered a blood-alcohol concentration of 0.15 percent.[3] As a result of the arrest and breathalyzer test results, the DMV suspended Brierton's driving privileges as of July 30, 2003.

---

[1] Vehicle Code section 23109, subdivision (c) provides: "A person shall not engage in any motor vehicle exhibition of speed on a highway, and no person shall aid or abet in a motor vehicle exhibition of speed on any highway."

" 'Highway' is a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel. Highway includes street." (Veh. Code, § 360.)

[2] " 'An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus . . . . [Citation.]' [Citation.]" (*People v. Williams* (1992) 3 Cal.App.4th 1326, 1330 [5 Cal.Rptr.2d 130].)

[3] Brierton was under 21 years old when the stop and arrest occurred. The legal limit of blood-alcohol concentration for a driver age 21 and over is .08 percent. (Veh. Code, § 13353.2, subd. (a)(1).) The limit for a driver under the age of 21 is .01 percent. (Veh. Code, § 13353.2, subd. (a)(2).) Thus, Brierton's blood-alcohol level was 15 times higher than the legal limit for his age, and almost twice the legal limit for drivers age 21 and over.

B. *Administrative proceedings before the DMV*

At Brierton's request, an administrative per se hearing was held on September 12, 2003, to determine whether the DMV's suspension of Brierton's license was justified.[4] The issues to be addressed at the hearing were (1) whether Officer Miller had reason to believe Brierton was driving in violation of Vehicle Code section 23152 or section 23153; (2) whether the arrest was lawful; and (3) whether Brierton had been driving with a blood-alcohol concentration of 0.08 percent or more. The DMV stayed the suspension of Brierton's driving privileges pending the outcome of the hearing.

A hearing officer conducted the hearing on behalf of the DMV. Brierton, his attorney, and Brierton's mother were present at the hearing. The hearing officer introduced two exhibits on behalf of the DMV: (1) Officer Miller's sworn statement set forth on form DS 367, dated July 30, 2003, and (2) a printout of Brierton's DMV driving record. Both exhibits were entered in evidence without objection. Brierton's attorney stated that he did not have any evidence to introduce, but that he wanted to present argument. Brierton's attorney argued that Officer Miller lacked reasonable cause to effect a traffic stop of Brierton on the night of the arrest; that the DMV had not shown that the stop that led to the arrest took place within a mile of the campus—the only noncampus area over which, Brierton argued, Officer Miller had jurisdictional authority to act; and/or that state statutes purporting to grant campus police officers the authority to act beyond campus boundaries unconstitutionally conflict with the law enforcement authority of charter cities.

The DMV issued a notification of findings and decision on September 19, 2003. In the notification of findings and decision, the DMV rejected all of Brierton's arguments, concluding that (1) the arresting officer had reasonable cause to believe Brierton was driving a vehicle in violation of Vehicle Code section 23140, 23152, or 23153; (2) Brierton was lawfully arrested; and (3) Brierton had been driving a vehicle while having 0.08 percent or more by weight of alcohol in his blood. The DMV reinstituted the suspension of Brierton's driving privileges.

C. *Proceedings in the trial court*

On September 24, 2003, Brierton filed a petition for a writ of mandate in the trial court, contending that there was no probable cause for the arrest, and that the campus police officer was acting beyond his territorial jurisdiction in

---

[4] Vehicle Code section 13558, subdivision (a) provides in part that any person who has received a notice or order of suspension or revocation of his or her driving privileges pursuant to a number of Vehicle Code sections, including section 13353.2, may request an administrative hearing on the matter.

arresting Brierton. The trial court denied Brierton's petition on February 19, 2004. The trial court rejected Brierton's jurisdictional challenge, concluding that the evidence submitted to the hearing officer was sufficient to meet the DMV's burden of proof and that there was no competent evidence calling into question Officer Miller's jurisdiction. Brierton sought reconsideration of the court's order. The court denied that request on March 9, 2004.

The trial court entered judgment in the matter on March 24, 2004, and filed a notice of entry of judgment on March 30. Brierton filed a notice of appeal from the judgment on April 12, 2004.

### D. *Proceedings before this court*

Brierton filed a petition for a writ of supersedeas in this court on April 13, 2004, and sought a temporary stay of the DMV's suspension of his driving privileges. We denied the request for a temporary stay on April 15, and denied Brierton's petition for a writ of supersedeas on April 28.

### III.

### DISCUSSION

Brierton raises two principal contentions in support of his argument that the court should prohibit the DMV from suspending his driver's license. First, Brierton argues that the DMV may not suspend his license because the arresting officer did not have reasonable suspicion to stop Brierton on the night of July 30, 2003. Second, Brierton argues that the arresting officer did not have the authority to stop or to arrest Brierton on a city street.

### A. *Standards of review*

A driver served with a DMV suspension notice is entitled to a hearing on request. (Veh. Code, § 13558, subd. (a); see also Veh. Code, § 14100, subd. (c) [right to request hearing "shall be made prominent on the notice" of suspension or revocation].) The administrative hearing is held before either the director of the DMV, a hearing board, or a department hearing officer. (Veh. Code, § 14104.2, subd. (a).) At a hearing to review the DMV's suspension of a driver's license as a result of an arrest for driving under the influence of alcohol, the sole issues to be determined by the hearing officer are whether "(A) . . . the peace officer had reasonable cause to believe that the person had been driving a motor vehicle in violation of [Vehicle Code]

Section . . . 23152[] or 23153. [¶] (B) . . . the person was placed under arrest . . . [and] [¶] (C) . . . the person was driving . . . [¶] [w]hen the person had 0.08 percent or more, by weight, of alcohol in his or her blood." (Veh. Code, § 13557, subd. (b)(2).)[5] If the hearing officer finds these three statutory prerequisites by a preponderance of the evidence, the driver's license to operate a motor vehicle will be suspended for a period of time that varies depending on the individual's previous driving record. (Veh. Code, § 13353.3.)

■ The DMV's ultimate determination to suspend a driver's license is subject to judicial review. (Veh. Code, § 13559.)[6] In ruling on an application for a writ of mandate following an order of suspension or revocation, a trial court must determine, based on its independent judgment, " 'whether the weight of the evidence supported the administrative decision. [Citation.]' [Citation.]" (*Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 638 [39 Cal.Rptr.2d 384] (*Gananian*).)

■ On appeal, we " 'review the record to determine whether the trial court's findings are supported by substantial evidence. [Citation.]' [Citation.]" (*Gananian, supra*, 33 Cal.App.4th at p. 638.) " 'We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citations.] Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's. [Citation.] We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings. [Citation.]' [Citation.]" (*Ibid.*) However, we review de novo any pure questions of law raised by the appeal. (*Foster v. Snyder* (1999) 76 Cal.App.4th 264, 267 [90 Cal.Rptr.2d 207].)

---

[5] The 0.08 percent standard applies to persons aged 21 and older. If the DMV determines that the individual in question had a blood-alcohol concentration of 0.08 percent, this determination necessarily satisfies the lower 0.01 standard that applies to Brierton, who was under 21 years of age at the time of the arrest.

[6] Vehicle Code section 13559 provides in pertinent part: "(a) Notwithstanding Section 14400 or 14401, within 30 days of the issuance of the notice of determination of the department sustaining an order of suspension or revocation of the person's privilege to operate a motor vehicle after the hearing pursuant to Section 13558, the person may file a petition for review of the order in the court of competent jurisdiction in the person's county of residence. The filing of a petition for judicial review shall not stay the order of suspension or revocation. The review shall be on the record of the hearing and the court shall not consider other evidence. If the court finds that the department exceeded its constitutional or statutory authority, made an erroneous interpretation of the law, acted in an arbitrary and capricious manner, or made a determination which is not supported by the evidence in the record, the court may order the department to rescind the order of suspension or revocation and return, or reissue a new license to, the person."

### B. *The circumstances of Brierton's driving provided reasonable suspicion to support the traffic stop*

■ Brierton contends that Officer Miller lacked reasonable suspicion to effect the traffic stop. According to Brierton, the only basis for the stop was that Brierton "accelerate[d] his vehicle . . . [and lost] traction, for approximately 20–25 feet." Brierton argues that this fact is insufficient to create reasonable suspicion that he had violated any provision of the Vehicle Code. We review the determination of reasonable suspicion independently, as it is a mixed question of fact and law. (See *People v. Celis* (2004) 33 Cal.4th 667, 679 [16 Cal.Rptr.3d 85, 93 P.3d 1027] [a reviewing court independently applies the requisite legal standard to the facts presented].)

■ "A police officer may stop and question persons on public streets, including those in vehicles, when the circumstances indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duties. [Citations.]" (*People v. Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353].) Under this standard, an officer may stop and briefly detain a suspect for questioning for a limited investigation even if the circumstances fall short of probable cause to arrest. (*People v. Jackson* (1990) 218 Cal.App.3d 1493, 1501 [267 Cal.Rptr. 841]; see also *Terry v. Ohio* (1968) 392 U.S. 1, 21–22 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

■ Reasonable suspicion that criminal conduct has occurred does not require that an officer observe all elements of criminal conduct; rather, it requires that officer to be able to "point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982].) Further, " '[t]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct.' [Citation.]" (*Kodani v. Snyder* (1999) 75 Cal.App.4th 471, 476–477 [89 Cal.Rptr.2d 362].)

■ In this case, Officer Miller decided to make the traffic stop at approximately 1:30 a.m., after he observed Brierton accelerate to such a degree so as to lose traction for 20 to 25 feet.[7] Brierton suggests that "[a]s a matter of logic, a 25-foot, approximately 2-second duration of loss of traction" is insufficient to provide reasonable suspicion of exhibition of speed.

---

[7] In briefing, Brierton suggests that the DMV "invented" facts, including the fact that the loss of traction occurred in direct view of a police officer. However, in his statement, Officer Miller says, "I observed Brierton accelerate his vehicle on the 5100 block of College Ave. . . . ." A reasonable inference is that Brierton accelerated while in Officer Miller's view.

However, a vehicle's loss of traction may be a significant indicator of a Vehicle Code violation: "It is common knowledge that maximum control of a vehicle upon the highway is maintained through the retention of traction between tires and pavement and that, during any process of skidding of the wheels of a vehicle, there is a corresponding diminution of the driver's control over the vehicle. . . . Where a person accelerates a vehicle in such manner as to deliberately cause it to skid, he is not only diminishing his control but increasing the hazard to bystanders or other vehicles from flying gravel. Whether the action is deliberate or not is for the trier of fact under the circumstances of the particular case. Obviously, not all cases of tire 'peeling' or 'screeching' would constitute violations of the statute. It is also common knowledge that the deliberate screeching and screaming of tires on the pavement are tension producers which increase nervousness in drivers and others, thereby increasing the likelihood of accident." (*People v. Grier* (1964) 226 Cal.App.2d 360, 363 [38 Cal.Rptr. 11].)

Further, Brierton's vehicle lost traction for a significant distance, in the early morning hours, on a street adjacent to a college campus, as a result of Brierton's acceleration. These facts were sufficient to create reasonable suspicion that a violation of the Vehicle Code had occurred or was occurring.

■ With respect to Brierton's contention that there could not have been reasonable suspicion because the record "does not show that Officer Miller cited Mr. Brierton for any violation of the exhibition of speed statute that allegedly prompted the stop," whether Officer Miller ultimately did or did not cite Brierton for a violation of the exhibition of speed statute is irrelevant for purposes of determining whether or not Officer Miller had reasonable suspicion to stop Brierton. A traffic stop is lawful at its inception if it is based on a reasonable suspicion that *any* traffic violation has occurred, even if it is ultimately determined that no violation did occur. (See *People v. Glick* (1988) 203 Cal.App.3d 796, 801–802 [250 Cal.Rptr. 315]; see also *People v. Miranda* (1993) 17 Cal.App.4th 917, 926 [21 Cal.Rptr.2d 785]; *Whren v. United States* (1996) 517 U.S. 806, 810 [135 L.Ed.2d 89, 116 S.Ct. 1769].) The officer's duty is to resolve—through investigation—any ambiguity presented as to whether the activity observed is, in fact, legal or illegal. (*People v. Leyba* (1981) 29 Cal.3d 591, 599 [174 Cal.Rptr. 867, 629 P.2d 961].) "The very notion that an ambiguity exists and requires resolution implies that an officer will not on each occasion view and be able to state exactly what is occurring." (*Ibid.*) The circumstances Officer Miller observed were sufficient to create a reasonable suspicion that Brierton was engaging in an exhibition of speed or that he was otherwise not in control of his vehicle and, thus, that he had violated the Vehicle Code. We conclude that under the circumstances presented here, Officer Miller had reasonable suspicion to effect a traffic stop of Brierton.

### C. *Officer Miller possessed territorial jurisdiction to make an otherwise lawful stop and arrest on the 5100 block of College Avenue*

Brierton contends that even if the stop was supported by reasonable suspicion, Officer Miller, as a campus police officer, did not have territorial jurisdiction to stop or to arrest Brierton. Brierton makes two related arguments as to why the DMV cannot establish that the stop and subsequent arrest were jurisdictionally lawful. He contends first that there was no evidence to support the conclusion that Officer Miller was acting within the statutory grant of territorial authority pertaining to campus police officers. Second, he claims that even if Officer Miller was acting within his territorial jurisdiction, any statute that purports to grant campus police the authority to enforce laws on charter city streets must be struck down as unconstitutional. We reject both contentions.

#### 1. *Officer Miller acted within his jurisdiction and authority in effecting the traffic stop and subsequent arrest of Brierton*

Brierton asserts that there was no evidence establishing that Officer Miller acted within his territorial jurisdiction in stopping and arresting Brierton on College Avenue. According to Brierton, pursuant to Education Code section 89560 and Penal Code section 830.2, the territorial jurisdiction of state university police is limited to state university campuses and the area within one mile of the exterior boundaries of the campus. He contends that there was no evidence in the record to indicate that the stop in this case took place within one mile of the SDSU campus, and that the DMV thus had no basis upon which to conclude that Officer Miller had the legal authority to arrest Brierton. We disagree with Brierton's presumption that the jurisdiction of campus police officers is limited to state campuses and the area within one mile of a campus boundary.

Penal Code section 830.2, which sets out the authority of state peace officers, provides that "[a] member of the California State University Police Departments appointed pursuant to Section 89560 of the Education Code" is among those "peace officers whose authority extends to any place in the state." (Pen. Code, § 830.2; *id.*, subd. (c).) Subdivision (c) of Penal Code section 830.2 provides that "the primary duty of the peace officer shall be the enforcement of the law within the area specified in Section 89560 of the Education Code."

The Education Code outlines the "area" referenced in Penal Code section 830.2, subdivision (c), providing in pertinent part that campus police "shall not exercise their powers or authority except (a) at the headquarters or upon any campus of the California State University and in an area within one

mile of the exterior boundaries of each campus . . . *and* (b) as provided in Section 830.2 of the Penal Code." (Ed. Code, § 89560, italics added.) Requirement (b) of Education Code section 89560 is a circular reference back to the Penal Code. The use of the word "and" between requirements (a) and (b) would, under usual principles of statutory construction, connote that a campus officer's authority is limited to *both* the campus areas (under (a)) *and* as provided in Penal Code section 830.2 (under (b)). In other words, because the word "and" rather than "or" is used in the text, this section would seem to require that *both* requirements (a) and (b) be met in order for a campus officer to have authority, and not *either* (a) *or* (b). It is unclear why an officer who is given statewide authority under Penal Code section 830.2 would be limited by the seemingly mandatory restriction of Education Code section 89560, resulting from the "and" between requirements (a) and (b). However, despite any ambiguity created by the inartfully drafted text of Education Code section 89560, we conclude that the intent of the statutes, when read together, is to create a class of state peace officers whose primary duty is law enforcement in and around state university campuses, but who nevertheless possess the authority to enforce the law statewide. (See *Baughman v. State of California* (1995) 38 Cal.App.4th 182, 189 [45 Cal.Rptr.2d 82].)[8]

In chapter 4.5 of title 3, part 2 of the Penal Code, the Legislature has created several classes of peace officers. The primary duty of certain sub-classes, like state university police officers, is outlined in section 830.2 of the Penal Code. Under this section, campus police officers, along with a wide range of other state peace officers, are granted law enforcement authority that "extends to any place in the state." Although the Legislature gives very broad peace officer authority to the types of peace officers listed in Penal Code section 830.1, the Legislature has outlined a "primary duty" for each class of peace officers listed in Penal Code section 830.2. For state university police, that "primary duty" is "enforcement of the law within the area specified in Section 89560 of the Education Code." (Pen. Code, § 830.2, subd. (c).) However, by identifying a "primary duty" the Legislature did not limit the authority of those persons listed in section 830.2, but rather specified the scope of their paramount duty. If the Legislature intended to limit campus officers' authority, it could have used the term "exclusive duty" or some similar term rather than using the term "primary duty."[9]

---

[8] We recognize that this interpretation renders the phrase "shall not exercise" in Education Code section 89560, as applied to requirement (a), surplusage. However, for the reasons set forth below, we conclude that the limitation in Education Code section 89560 yields to the wide grant of authority in Penal Code section 830.2.

[9] That the Legislature intended Penal Code section 830.2 to grant campus officers the authority to act throughout the state is further supported by the fact that prior to amendments enacted in 1980, the Penal Code more strictly limited the jurisdiction of state university police by stating that in addition to having a primary duty in the areas defined by the Education Code,

This legislative design indicates an intent to have each class of peace officer enforce the laws within the ambit of their specified employment duties, and to make other law enforcement actions the exception rather than the rule. Generally speaking, under this system, California Highway Patrol officers should not be focusing on patrolling the state university campuses and campus police officers should not be spending their time patrolling public highways. However, this does not mean that California Highway Patrol officers do not have the authority to enforce state laws on university campuses or that campus police officers do not have the authority to enforce state laws outside of a university campus (or beyond the area within one mile of a university campus). We conclude that Officer Miller possessed the authority to stop and arrest Brierton, regardless of where the stop and arrest took place.

> 2. *The statutes granting campus police officers authority to act beyond campus boundaries do not unconstitutionally conflict with the authority of charter cities*

 Brierton contends that regardless of where the stop occurred, Officer Miller did not have jurisdiction to stop Brierton or to arrest him because both events occurred on a City street and not on the SDSU campus. Brierton asserts that Penal Code section 830.2 and Education Code section 89560— state statutes which, at a minimum, grant or acknowledge that campus police have the authority to enforce laws beyond the confines of a state university campus—unconstitutionally conflict with a charter city's law enforcement power. Specifically, Brierton claims that the "extraterritorial jurisdiction provisions of Education Code section 89560 and Penal Code section 830.2 conflict with article XI, section 5 of the California Constitution" because that portion of the Constitution "gives exclusive general law enforcement authority to the police force of a charter city." Thus, according to Brierton, the statutes purporting to authorize Officer Miller to enforce state law on city streets beyond campus boundaries cannot be given effect. As a result, Brierton maintains, a campus police officer may lawfully arrest a person outside of campus boundaries only if there exists either (1) a nexus between the statutory violation and campus security or (2) an agreement between the city and campus police. We conclude that Brierton misreads article XI, section 5 of the California Constitution, and that the state statutes at issue here do not conflict with the powers granted to the City under the Constitution.

---

a state university officer "shall not act as a peace officer in enforcing any law except (1) when in pursuit of any offender or suspected offender or (2) to make arrests for crimes committed in his presence." The statute no longer places any such limitation on campus police officers' statewide authority.

■ The California Constitution grants charter cities like San Diego the power to "make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws." (Cal. Const., art. XI, § 5, subd. (a).) Brierton maintains that because the City has created a police department pursuant to its constitutionally granted charter power, the City's police agencies possess exclusive law enforcement powers within their jurisdiction. Although we agree that the City's law enforcement agencies have general law enforcement powers within the geographical boundaries of the City, we have found no authority supporting the contention that the constitutional granting of general law enforcement power is an *exclusive* grant of law enforcement power.

■ The California Constitution grants charter cities the power to make and enforce "all ordinances and regulations *in respect to municipal affairs*." (Calif. Const., art. XI, § 5, subd. (a), italics added.) Enforcement of the Vehicle Code is, however, a statewide affair. It has long been recognized that "[t]he streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control." (*Ex parte Daniels* (1920) 183 Cal. 636, 639 [192 P. 442].) Moreover, "[t]he right of control over street traffic is an exercise of a part of the sovereign power of the state. [Citation.] While it is true that the regulation of traffic upon a public street is of special interest to the people of a municipality, it does not follow that such regulation is a municipal affair, and if there is a doubt as to whether or not such regulation is a municipal affair, that doubt must be resolved in favor of the legislative authority of the state." (*Ibid.*)

■ The Vehicle Code is a state statute, applicable throughout the state and in every local jurisdiction. On that basis, we conclude that enforcement of the Vehicle Code is not the sort of "municipal affair" over which the California Constitution grants charter cities exclusive control (see, e.g., *Mervynne v. Acker* (1961) 189 Cal.App.2d 558, 562 [11 Cal.Rptr. 340] [discussing previous version of constitutional grant of power to charter cities and holding that traffic control on public highways is not a "municipal affair" such that charter municipality can derogate power of the state]; see also *Ex parte Daniels, supra*, 183 Cal. at p. 639), and we reject Brierton's contention that the California Constitution "gives exclusive enforcement authority to the police force of a charter city." (See *Pinewood Investors v. City of Oxnard* (1982) 133 Cal.App.3d 1030, 1040 [184 Cal.Rptr. 417] [Cal. Const. provides for " 'a limited delegation of the police power to cities,' and does not enable a municipality to ignore a specific governing statute dealing with a particular subject.' "].)

■ Because the City does not have exclusive traffic enforcement powers, neither the authorization of statewide enforcement power for campus

police officers under Penal Code section 830.2, subdivision (c) nor the limitation of the primary exercise of this power under Education Code section 89560 to areas within one mile of campuses "conflicts" with the City's law enforcement powers. As a result, we conclude that under the circumstances in this case, Officer Miller had the statutory authority to stop and to subsequently arrest Brierton.

## IV.

## CONCLUSION

Brierton's acceleration of speed and loss of traction at 1:30 a.m. on a street just outside of the SDSU campus was sufficient to give Officer Miller reasonable suspicion that Brierton was acting in violation of the Vehicle Code and thus justified the traffic stop of Brierton. Officer Miller possessed the authority to stop and arrest Brierton at a location outside the SDSU campus on the 5100 block of College Avenue, because Penal Code section 830.2 grants state university police authority that extends throughout the state. Finally, the Penal Code and Education Code provisions pertaining to the authority of campus police officers to act as peace officers throughout the state do not infringe on the City's power to make and enforce ordinances and/or regulations with respect to municipal affairs, under article XI, section 5, subdivision (a) of the California Constitution. Therefore, the traffic stop and subsequent arrest of Brierton were lawful. The DMV thus acted lawfully in suspending Brierton's driver's license.

## V.

## DISPOSITION

The judgment is affirmed.

Huffman, J., concurred.

**BENKE, Acting P. J.,** Concurring.—I concur in the result reached in the majority opinion. I write separately because I do not share my colleagues' perplexity over the language and relationship of Education Code[1] section 89560 and Penal Code section 830.2, subdivision (c).

---

[1] All further statutory references are to the Education Code unless otherwise specified.

Section 89560 authorizes the trustees of the state college system to establish a police department and grants peace officer status to the state campus police within that jurisdiction. Under section 89560, if a campus police force is established, its primary duties lie within one mile of campus boundaries.[2]

The trustees of the state college system of course have no power to establish a statewide police force. Nor do they have the power to grant their campus police statewide jurisdiction. Any extension of jurisdiction for state police beyond their primary responsibilities must be left to the Legislature. Section 89560 acknowledges the possibility that the Legislature may choose to establish, limit or expand the jurisdiction of campus police beyond their primary responsibilities.

Penal Code section 830.2, subdivision (c), is a mirror image of section 89560. It allows campus police statewide peace officer status with primary responsibility as may be set forth by the state college trustees in section 89560.

It is perfectly consistent, and at least not to me confusing or extraneous, for the Legislature to instruct the state college trustees that, whatever power and authorities they may grant to their police, that power shall not be exercised *except* as to primary duties within the one mile radius of a college campus *and* as may be further delineated by the Legislature through Penal Code section 830.2. One consequence of this language is that should the Legislature choose not to add any jurisdiction beyond the primary responsibilities set forth in the Education Code, campus police officers would be confined to jurisdiction solely within the one mile radius. In short, the Legislature intends that Penal Code section 830.2 operate as the mechanism by which it will expand or choose not to expand campus police jurisdiction beyond their primary responsibilities. The language of the statutes expresses the clear intent of the Legislature and that intent is controlling. (*People v. Herman* (2002) 97 Cal.App.4th 1369 [119 Cal.Rptr.2d 199].) There is nothing inconsistent in a campus police officer having primary peace officer responsibilities within boundaries and peace officer status if needed throughout the state. Any doubt on the issue was resolved in *People v. Baughman* (1995) 38 Cal.App.4th 182, 189 [45 Cal.Rptr.2d 82].

---

[2] These duties have at times been discussed in terms of custodial responsibilities. (See *People v. Dickson* (1979) 91 Cal.App.3d 409, 414 [154 Cal.Rptr. 116, 26 Ops.Cal.Atty.Gen. 61, 66–67] (Aug. 15, 1955).)

Because I find the relationship between the statutes clear and their language unambiguous, I concur in the result reached by the majority.

A petition for a rehearing was denied June 30, 2005, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 12, 2005. Kennard, J., was of the opinion that the petition should be granted.