Filed 4/12/21  Fail v. Department of Motor Vehicles CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAMES C. FAIL,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DEPARTMENT OF MOTOR VEHICLES,<br><br>    Defendant and Respondent. | D076364<br><br><br>(Super. Ct. No. ECU000781) |

APPEAL from a judgment of the Superior Court of Imperial County, L. Brooks Anderholt, Judge.  Affirmed.

Law Offices of Robert A. Espinosa, Espinosa Espinosa & Farias, Robert A. Espinosa, and Daniel R. Espinosa for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Chris A. Knudsen, Assistant Attorney General, Jodi L. Cleesattle and Celine M. Cooper, Deputy Attorneys General, for Defendant and Respondent.

## I.

## INTRODUCTION

After being arrested for driving under the influence and driving with a blood alcohol content of .08 percent or more (Veh. Code, § 23152, subds. (a), (b)),[1] James C. Fail filed a petition for writ of mandate in the trial court seeking to overturn the suspension of his driver's license by the Department of Motor Vehicles (Department). The trial court denied the petition, ruling that the Department properly suspended Fail's driver's license pursuant to the administrative per se law (§ 13353.2 et seq.).[2] On appeal, Fail claims that there is "no substantial, competent evidence to support the necessary facts for a suspension." (Boldface & capitalization omitted.) We affirm the judgment.

---

[1] Unless otherwise specified, all subsequent statutory references are to the Vehicle Code.

Section 23152 provides in relevant part:

"(a) It is unlawful for a person who is under the influence of any alcoholic beverage to drive a vehicle.

"(b) It is unlawful for a person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle."

[2] As described in greater detail in part III.A.1, *post*, "Under California's 'administrative per se' law, the [Department] must suspend the driving privilege of a person who was driving a motor vehicle with a blood-alcohol level of 0.08 percent or more." (*Delgado v. Department of Motor Vehicles* (2020) 50 Cal.App.5th 572, 576.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Fail's arrest*

At approximately 10:50 p.m. on February 3, 2018, California Highway Patrol Officer E. Soltero Jr. was on patrol in his vehicle when he noticed a sedan with its tail lights not functioning properly traveling near him. Officer Soltero initiated a traffic stop. After stopping the vehicle, Officer Soltero approached the vehicle and spoke with the driver, later identified as Fail.

While speaking with Fail, Officer Soltero observed that Fail's eyes were red and watery and that he smelled of alcohol. Fail admitted to having consumed three or four Heineken Lights before driving.

Officer Soltero directed Fail to exit his vehicle and asked him a series of field sobriety test questions. When Officer Soltero asked Fail when he had stopped drinking, Fail responded that he did not know. Officer Soltero also had Fail perform a series of field sobriety tests. Fail performed unsatisfactorily on the tests. Fail also refused to take a preliminary alcohol screening test.

At 11:14 p.m., Officer Soltero placed Fail under arrest for driving under the influence. (§ 23152, subd. (a).) After arresting Fail, Officer Soltero administered two blood alcohol breath tests. The first sample, taken from Fail at 11:18 p.m., gave a reading of 0.08 percent blood alcohol content. The second sample, taken three minutes after the first sample, provided an identical reading.

Officer Soltero arrested Fail for the additional offense of driving with a blood alcohol level of .08 or more (§ 23152, subd. (b)), and issued a notice suspending Fail's driver's license pursuant to the administrative per se law (§ 13353.2 et seq.).

3

B.  *The administrative per se hearing*

Fail requested an administrative hearing to contest the suspension of his driver's license.  At the hearing, a hearing officer admitted documentary evidence pertaining to Fail's arrest, including Officer Soltero's sworn statement and investigative report.

Fail offered the expert opinion testimony of Okorie Okorocha, a forensic toxicologist.  Okorocha stated that in his opinion, Fail's blood alcohol level at the time he was driving and at the time of the test was below .08 percent and that it was at "a maximum of a .07 [percent]."  Okorocha stated that this was so because Fail was in the "absorptive phase" of alcohol consumption and because the device used to measure Fail's breath was "reading high."  Fail also introduced in evidence a document that contained a record of various "accuracy checks" that were performed on the device used to measure Fail's blood alcohol content on certain days over a period of approximately two months around the time of Fail's arrest.[3]

In rebuttal, the Department presented expert testimony from Jennifer Dernoncourt, a Senior Criminologist at the Department of Justice Crime Lab in Riverside.  As discussed in greater detail in III.D.3.a.i, *post*, Dernoncourt testified concerning the device used to test Fail's breath.

The Department hearing officer issued a decision upholding the suspension of Fail's driver's license.  The hearing officer found that Officer Soltero had reasonable cause to believe that Fail was driving a motor vehicle while under the influence of alcohol; Fail was lawfully arrested; and Fail was driving with .08 percent or more blood alcohol level.

---

3     We discuss in detail the results of those tests in part III.D, *post*.

C. *Fail's writ petition*

Fail filed a petition for writ of administrative mandate in the trial court in which he argued that there was no reasonable cause for Officer Soltero to believe that Fail had been driving in violation of section 23152, that Fail was unlawfully arrested and that there was not substantial evidence that Fail's blood alcohol content was "over a .08 at the time of the stop or at the time of the test."

After briefing and a hearing, the trial court denied Fail's petition. In its statement of decision, the trial court found that Fail's stop and arrest were lawful and that Fail had driven with a prohibited blood alcohol content of .08 percent or more. The court entered a judgment denying the petition.

D. *The appeal*

Fail appeals the judgment.

## III.

## DISCUSSION

*There is substantial evidence in the record to support the trial court's findings with respect to the Department's suspension of Fail's driver's license*

Fail contends that there is no substantial and competent evidence in the record sufficient to support the Department's suspension of his driver's license pursuant to the administrative per se law (§ 13353.2 et seq.).

A. *Governing law and standard of review*

    1. *Administrative per se proceedings*

In *Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1207–1208 (*Coffey*), the Supreme Court summarized California's administrative per se law (§ 13353.2 et seq.), " 'under which a person arrested for driving under the influence of alcohol, and who is determined to have a prohibited amount of alcohol in his

5

or her blood, must have driving privileges suspended prior to an actual conviction for a criminal offense' " (*Coffey, supra*, at p. 1207), as follows:

> "Pursuant to the administrative per se law, '[a]fter either the arresting officer or the [Department] serves a person with a "notice of an order of suspension or revocation of the person's [driver's license]," the [Department] automatically reviews the merits of the suspension or revocation. [Citation.] The standard of review is preponderance of the evidence [citation], and the department bears the burden of proof [citations].' [Citation.] A driver served with such a suspension notice is entitled to a hearing on request [citation], at which the only issues to be decided . . . are whether the arresting officer had reasonable cause to believe she was driving, whether she was arrested for an enumerated offense,[4] and whether she was driving with 0.08 percent [blood alcohol content] or higher [citation]. If the [Department] hearing officer finds these three statutory prerequisites proved by a preponderance of the evidence, the accused's driver's license will be suspended . . . ." (*Id.* at pp. 1207–1208.)

2. *Writ proceedings challenging the Department's suspension decision*

The *Coffey* court explained that a driver whose license is suspended pursuant to the administrative per se law may file a petition for writ of mandate seeking to overturn the suspension:

> "A driver whose license has been suspended under the administrative per se law can seek review of the [Department's] decision by seeking a writ of mandate in the trial court. 'In ruling on an application for a writ of mandate following an order of suspension or revocation, a

---

4    Although not expressly stated in the *Coffey* court's summary of the administrative per se law, it is well established that it is the Department's burden to prove that the officer had reasonable cause to believe that the driver was driving in violation of certain Vehicle Code sections, including, section 23152, and that the officer *lawfully* arrested the driver. (See, e.g., *Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 638; see § 13557, subd. (b)(3)(A), (B), & (C).)

trial court is required to determine, based on its independent judgment, " 'whether the weight of the evidence supported the administrative decision.' " ' [Citation.]" (*Coffey, supra*, 60 Cal.4th at p. 1217.)

### 3. *Standard of review*

The *Coffey* court also explained the limited scope of appellate review that applies to substantial evidence challenges following the denial of a petition for writ of mandate seeking to overturn the Department administrative hearing officer's decision:

> "Following the trial court's denial of the writ, the scope of our review on appeal is limited: '[W]e "need only review the record to determine whether the trial court's findings are supported by substantial evidence." [Citation.] " 'We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citations.] Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's. [Citation.] We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings.' " ' [Citation.]" (*Coffey, supra,* 60 Cal.4th at p. 1217.)[5]

---

5    While Fail contends that this court "examine[s] the findings made by the *agency* itself to determine whether they were supported by substantial evidence, rather than limiting [itself] to a review of the trial court's findings," the law is clear and settled that this court reviews the *trial court's* factual findings. (See, e.g., *Coffey, supra*, 60 Cal.4th at p. 1217; *Lake v. Reed* (1997) 16 Cal.4th 448, 457 ["On appeal, we 'need only review the record to determine whether the *trial court*'s findings are supported by substantial evidence' " (italics added)]; *Murphey v. Shiomoto* (2017) 13 Cal.App.5th 1052, 1069 [same].)

7

B. *There is substantial evidence to support the trial court's finding that Officer Soltero had reasonable cause to believe that Fail had driven in violation of section 23152*

Fail contends that Officer Soltero did not have reasonable cause to believe that Fail had violated section 23152.

" 'Reasonable cause . . . [is] such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' " (*Cantrell v. Zolin* (1994) 23 Cal.App.4th 128, 133 [discussing "reasonable cause" element in administrative per se hearing].)

Fail argues that Officer Soltero did not have reasonable cause to believe that he had violated section 23152 because, according to Fail, Officer Soltero formed his opinion that Fail was intoxicated solely on the basis of Fail's bloodshot and watery eyes and the odor of alcohol on Fail's breath and emanating from the interior of Fail's vehicle. Specifically, Fail argues:

> "At the time [Officer] Soltero arrested Fail, he had no reasonable cause to believe [Fail] was [driving under the influence] in violation of section 23152 . . . . Even though [Officer] Soltero had observed Fail walking, driving, parking, speaking; had detected the odor of alcohol; and, even though [Fail] refused to submit to a voluntary PAS [preliminary alcohol screening] test [Officer Soltero] could not have not formed an opinion about [Fail's] sobriety *strictly by [Fail's] alleged bloodshot watery eyes and odor of alcohol, as [Officer Soltero] did here*." (Italics added.)

Fail's argument is without merit. In his investigation report, Officer Soltero noted that, at approximately 10:50 p.m., he observed a vehicle traveling with its "tail lights not functioning properly." After stopping the vehicle, Officer Soltero approached the driver, Fail, and spoke with him.

8

According to Officer Soltero, while speaking with Fail, he "observed objective signs and symptoms of impairment and detected a strong odor of an alcoholic beverage emitting from both within [Fail's vehicle] and [Fail's] breath." Officer Soltero further stated that Fail admitted having "consumed 3 or 4 Heineken [L]ights." In addition, Officer Soltero stated that Fail "was unable to perform" a series of field sobriety tests and Soltero outlined Fail's performance on those tests. Finally, Officer Soltero stated:

> "Based on Fail's objective signs and symptoms of alcohol consumption, his driving, his statements, his [field sobriety tests] and my training and experience, I placed Fail under arrest for [violating section] 23152[, subdivision](a) . . . ."

The trial court relied on this evidence in finding that Officer Soltero had "probable cause[6] . . . to arrest [Fail]."

It is clear from the record that Officer Soltero did *not* form his opinion that Fail was intoxicated *solely* on the basis of Fail's bloodshot and watery eyes and the odor of alcohol on Fail's breath and inside his vehicle. Rather, he formed that opinion on the basis of all of the evidence described above, including Fail's admission to having consumed three or four beers and his failing a series of field sobriety tests. This evidence constitutes substantial evidence to support the trial court's finding that Officer Soltero had

---

6      Reasonable cause and probable cause are synonymous. (See *People v. Mower* (2002) 28 Cal.4th 457, 473.)

9

reasonable/probable cause[7] to believe that Fail had driven in violation of section 23152.[8]

C. *There is substantial evidence to support the trial court's finding that Officer Soltero lawfully arrested Fail*

Fail contends that his arrest was not lawful. Although the precise basis of Fail's claim is not entirely clear from his brief, Fail references his unsatisfactory performance on the field sobriety tests, and argues "[a] search is not made legal by what it turns up." Fail thus appears to contend that his arrest was unlawful because Officer Soltero illegally administered the field sobriety tests.

An officer may conduct a brief investigation into a driver's sobriety based upon reasonable suspicion of his intoxication. (See *Brierton v. Department of Motor Vehicles* (2005) 130 Cal.App.4th 499, 509 (*Brierton*).) "Reasonable suspicion that criminal conduct has occurred does not require that an officer observe all elements of criminal conduct; rather, it requires

_____

[7]   We discuss the distinct legal concept of reasonable *suspicion* in part III.C, *post*.

[8]   In contending that Officer Soltero did not have reasonable cause to believe that Fail had violated section 23152, Fail argues that, in conducting the field sobriety tests, Officer Soltero violated "GO [California Highway Patrol General Order] 100.61 to place a citizen out of view of the MVARS [mobile video audio recording system]." Fail does not make any argument as to how this alleged failure impacts the application of the administrative per se law. Accordingly, we disregard the contention. (See, e.g., *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*) [" 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived.' [Citation.] It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

that officer to be able to 'point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' " (*Ibid.*)

As noted in part III.B, *ante*, Officer Soltero stated in his investigation report, "While speaking with Fail, I observed objective signs and symptoms of impairment and detected a strong odor of an alcoholic beverage emitting from both within [Fail's vehicle] and [Fail's] exhaled breath." Officer Soltero also stated that Fail admitted having consumed three or four beers and that, based on these observations and Fail's admission, he decided to administer a series of field sobriety tests. The trial court found that Officer Soltero's "observation of red, watery eyes, the smell of alcohol, and [Fail's] admission that [he] had been drinking are enough for a reasonable officer to find reasonable suspicion to conduct field sobriety tests."

Evidence that Officer Soltero observed Fail's bloodshot and watery eyes, smelled alcohol on Fail's breath, and heard Fail's admission to drinking constitutes substantial evidence supporting the trial court's finding that Officer Soltero had a reasonable suspicion that Fail might be driving under the influence. (*Brierton, supra,* 130 Cal.App.4th at p. 509.) Therefore, to the extent Fail's claim of an unlawful arrest is based on Officer Soltero having illegally conducted field sobriety tests, we reject his claim.

In addition to contending that Officer Soltero acted illegally in subjecting him to field sobriety tests, Fail contends, "The arrest was strictly made because [Officer Soltero] observed (1) bloodshot, watery eyes and (2) [Fail] had an odor of alcoholic beverage, neither of which are illegal."[9]

_____

9      To the extent that Fail's brief may be read as arguing that his arrest was unlawful because Officer Soltero arrested him *before* administering field

11

Fail argues further, "The arrest predicated upon the aforementioned conditions was illegal and without probable cause." We are unpersuaded. As explained above, there is substantial evidence in the record to support a finding that Officer Soltero had *reasonable suspicion* to investigate Fail's sobriety by administering the *field sobriety tests*. Further, as we stated in part III.B, *ante*, the results of those tests, together with Officer Soltero's other observations on the night of the incident and Fail's admission to having consumed three or four beers, amounted to *probable cause* to *arrest* Fail for driving under the influence in violation of section 23152, subdivision (a).[10]

Accordingly, we conclude that there was substantial evidence to support the trial court's finding that Officer Soltero lawfully arrested Fail.

D. *There is substantial evidence to support the trial court's finding that Fail drove with a blood alcohol content of .08 percent or more*

Fail contends that, notwithstanding that he registered a .08 percent blood alcohol content on two chemical breath tests, defense expert Okorocha's

---

sobriety tests, we disagree. Officer Soltero's investigative report expressly states that he arrested Fail *after* Fail's unsatisfactory performance of field sobriety tests. In addition, Fail does not appear to challenge the lawfulness of Officer Soltero's initial stop, which the officer stated in his investigative report was premised on his observation that Fail's vehicle's "tail lights [were] not functioning properly, a violation of [section] 24252[, subdivision] (a)." Further, as stated in the text, Fail's detention *after* the stop, but *prior* to his arrest, was based on the officer's reasonable suspicion that Fail was driving under the influence. In other words, Officer Soltero legally *detained* Fail in order to conduct field sobriety tests, and Soltero's administration of those tests did not transform Fail's detention into an *arrest*.

10    As noted in part II.A, *ante, after* arresting Fail, Officer Soltero administered blood alcohol breath tests. The results of those tests provided Officer Soltero with probable cause to arrest Fail for the *additional* offense of driving with a blood alcohol content of .08 percent or more in violation of section 23152, subdivision (b).

12

testimony established that Fail had a blood alcohol content of less than .08 percent while driving. Fail offers two arguments in support of this contention. First, he notes that Okorocha testified that the scientific literature establishes that breath blood alcohol tests provide an inflated reading of a subject's blood alcohol content during the "absorptive phase" of alcohol consumption. Fail argues further that Okorocha testified that Fail was in the absorptive phase at the time Fail registered the .08 percent blood alcohol content readings and that his true blood alcohol content was necessarily lower. Second, Fail contends that Okorocha's testimony, when considered together with a testing report for the device used to measure Fail's breath, established that the device inaccurately registered Fail's blood alcohol content and that his true blood alcohol content at the time of the test was below .08 percent.

We first discuss the evidence in the record supporting the trial court's finding that Fail had driven with a blood alcohol content of .08 percent or more. Next, we consider each of Fail's arguments in support of his claim that Okorocha's testimony established that Fail had not driven with a blood alcohol content of .08 percent or more.

1. *Evidence that Fail drove with a blood alcohol content of .08 percent or more*

   a. *Governing law*

Section 23152, subdivision (b) provides:

> "In any prosecution under this subdivision, it is a rebuttable presumption that the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after the driving."

13

"Although the statutory language speaks in terms of a 'prosecution,' several Courts of Appeal have held this presumption is not limited to criminal prosecutions but also applies in administrative license suspension proceedings." (*Coffey, supra*, 60 Cal.4th at p. 1208.) This court is among the courts that have so held. (See *Jackson v. Department of Motor Vehicles* (1994) 22 Cal.App.4th 730, 740.)

While the Supreme Court has not definitively determined whether the presumption applies in administrative per se hearings (*Coffey, supra*, 60 Cal.4th at p. 1209), the law is clear that, if a defendant offers evidence sufficient to rebut the presumption, the Department is required to prove a driver's blood alcohol content at the time she was driving without resort to the statutory presumption. (*Id.* at p. 1211.)

In attempting to carrying that burden, the Department may rely on evidence that gave rise to the statutory presumption in the first place (*Coffey, supra*, 60 Cal.4th at p. 1209)[11]—namely, chemical test evidence—as well as

---

[11] The *Coffey* court explained the operation of the rebuttable presumption contained in section 23152, subdivision (b) as follows:

> "A rebuttable presumption requires the trier of fact, given a showing of the preliminary fact (here, that a chemical test result showed plaintiff had a [blood alcohol content] of 0.08 percent or more within three hours of driving), to assume the existence of the presumed fact (here, that plaintiff had been driving with a prohibited [blood alcohol content]) 'unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' [Citation.] In other words, if evidence sufficient to negate the presumed fact is presented, the 'presumption disappears' [citation] and 'has no further effect' [citation], although 'inferences may nevertheless be drawn from the same circumstances that gave rise to the

14

other circumstantial evidence of a defendant's intoxication, including an officer's observations of a driver and the driver's performance on field sobriety tests. (*Id.* at pp. 1217–1218, disapproving *Brenner v. Department of Motor Vehicles* (2010) 189 Cal.App.4th 365 (*Brenner*).)

b. *Application*

The record contains evidence of the results of two chemical breath tests that Officer Soltero administered on Fail within approximately 30 minutes of the traffic stop. Both tests registered a .08 percent blood alcohol content. Even assuming that Fail rebutted the statutory *presumption* pertaining to driving with a prohibited blood alcohol content contained in section 23152, subdivision (b) by presenting expert testimony that Fail's true blood alcohol content was lower than that registered by the tests,[12] the trial court could still find that Fail had driven with a prohibited blood alcohol content based on the results of the chemical breath tests administered by Officer Soltero. (*Coffey, supra*, 60 Cal.4th at p. 1209 [even in cases in which the defendant rebuts a statutory presumption " 'inferences may nevertheless be drawn from

---

presumption in the first place' [citations]." (*Coffey, supra*, 60 Cal.4th at pp. 1209–1210.)

[12] Even assuming that Fail presented evidence that was legally *sufficient* to rebut the section 23152, subdivision (b) presumption, the trial court was not required to find that evidence to be *credible*. (See *Coffey, supra*, 60 Cal.4th at p. 1211 [stating that driver provided expert testimony that sufficiently rebutted assumed section 23152, subdivision (b) presumption because "*if believed,* [expert] evidence would have justified a conclusion that plaintiff's [blood alcohol content] was rising at the time of her chemical tests and was thus quite possibly below the 0.08 percent threshold at the time she had been driving" (italics added)].)

We discuss the grounds on which the trial court could have reasonably refused to credit expert testimony offered by the defense that Fail had not driven with a blood alcohol content of .08 percent or more in addressing Fail's contentions in parts III.D.2 and III.D.3, *post.*

the same circumstances that gave rise to the presumption in the first place' "].)

In addition, the Department presented circumstantial evidence of Fail's intoxication that supported the trial court's finding that Fail had driven with a prohibited blood alcohol content. That evidence included Officer Soltero's observations of Fail as having bloodshot and watery eyes and smelling of alcohol, Fail's admission to have consumed three or four beers, and Fail's inadequate performance on the field sobriety tests. (See *Coffey, supra,* 60 Cal.4th at pp. 1212–1216.)

> 2. *The trial court was not required to credit Okorocha's testimony that Fail was in the absorptive phase of alcohol consumption at the time that he was driving and that his true blood alcohol content was therefore less than .08 percent*

Fail contends that Okorocha's testimony demonstrated that Fail was in the absorptive phase of alcohol consumption at the time that he was driving, and that his true blood alcohol content was therefore less than .08 percent.

> a. *Factual and procedural background*

> i. *Evidence at the administrative per se hearing*

As noted in part II.B, *ante,* at the administrative per se hearing, the Department introduced in evidence Officer Soltero's investigative report. In the report, Officer Soltero indicated that Fail had admitted drinking four Heineken Lights[13] and that Fail stated that he had started drinking at 6:00 p.m. In a box labeled, "Time Stopped," pertaining to the time the subject had stopped drinking, Officer Soltero wrote that Fail had stated, "I don't know."

---

[13]    In the narrative portion of the report, Officer Soltero stated that Fail admitted drinking "3 or 4" Heineken Lights.

At the hearing, Fail's counsel asked Okorocha whether he could "tell us a little bit about breath testing . . . and what the reliability is as it relates to a breath test that is done in the absorptive phase." Okorocha responded:

> "When you're absorbing alcohol, the breath test reads falsely high, which is because when alcohol is absorbed into the bloodstream, it first goes into the arterial system. However, . . . we measure impairment based on what's in the veins or the venous system. The breath that comes out of the mouth and into the device comes from . . . the airways, and the blood that lines the airways is arterial. So while you're absorbing, the arterial is always higher.
>
> "And so when you're absorbing, you're always going to read higher on the breath than you normally would on the blood. And the scientific literature indicates that you can read falsely high by two to three times or even higher."

Fail's counsel then asked Okorocha about whether Fail "was absorptive." Okorocha stated:

> "[W]e can't go by the timing because he said he didn't know when he finished drinking, but the police report indicates that [Fail] had the odor of an alcoholic beverage. If he had the odor of an alcoholic beverage, that means the alcohol is still in your stomach because that's where breath odors come from. Kind of like if somebody has a garlic dinner and burps, you can smell it because it's coming up from the stomach.
>
> "If it's fully absorbed, it would be all in his blood stream and there would be nothing to smell. So if we know he has the odor of an alcoholic beverage, the alcohol is still in his stomach. And if the alcohol is still in your stomach, you're still absorbing."

Fail's counsel also asked Okorocha the following question concerning the timing of Fail's drinking and his blood alcohol content:

"If [Fail] had a last drink within a half hour of his stopping, would you say that his blood-alcohol was rising?"

Okorocha responded, "Absolutely."

Okorocha also stated that eating generally causes the absorption phase to last longer.

The hearing officer also asked several questions concerning Okorocha's absorption theory, including the following:

"So my question I guess would be with an unknown if there is indeed an unknown drinking pattern as far as the last -- the time of the last drink, can you formulate an opinion of how much alcohol remained in Mr. Fail's system at that time?"

Okorocha responded, "I can't say how much was in his stomach at the time."

ii. *The trial court's statement of decision*

In its statement of decision, the trial court found that Okorocha's testimony concerning the absorptive phase of alcohol consumption was unpersuasive. The court noted that Officer Soltero's investigative report indicated "that [Fail's] answer to when he stopped drinking was 'I don't know' . . . ." The trial court also noted that "[n]o testimony was given at [the] hearing about when [Fail] stopped drinking . . . ." The court reasoned, "Without evidence showing [Fail] was in the absorptive phase at the time of the test, any evidence regarding falsely high readings during the absorptive phase is irrelevant."

b. *Application*

The law is clear that a trial court is not required to accept a defense expert's testimony at an administrative per se hearing "at face value." (*Coffey, supra*, 60 Cal.4th at p. 1218; see also *Morgenstern v. Department of*

18

*Motor Vehicles* (2003) 111 Cal.App.4th 366, 372 [stating that in writ proceedings reviewing administrative per se hearings the trial court "makes its own determination about the credibility of the witnesses"].)

The Department presented evidence that Fail acknowledged having started drinking at 6:00 p.m., approximately five hours prior to being stopped by Officer Soltero. The Department also presented evidence that Fail stated on the night of the incident that he did not know when he had stopped drinking. In addition, Fail did not present any evidence at the administrative per se hearing as to either when he had stopped drinking or his pattern of drinking on the evening in question. Further, the trial court could have reasonably found that Okorocha's testimony that the odor of alcohol on Fail's breath demonstrated that Fail was in the absorptive phase of alcohol consumption was speculative. The trial court could therefore have also reasonably refused to credit Okorocha's testimony that Fail's blood alcohol tests did not reflect his true blood alcohol content because he was in the absorptive phase of alcohol consumption.

3. *Fail is not entitled to reversal on the ground that the trial court erred in failing to find that the device used to measure his blood alcohol content was inaccurate*

Fail maintains that Okorocha's testimony, when considered in connection with the accuracy testing report for the device used to measure Fail's breath, demonstrated that Fail was driving with a blood alcohol content of less than .08 percent.

a. *Factual and procedural background*

i. *The administrative per se hearing*

At the administrative per se hearing, Fail offered in evidence a document titled "Breath Alcohol Subject Report." The report recorded "Accuracy Check" results performed on the device used to measure Fail's

blood alcohol content from Fail's breath.[14]  Specifically, the report contained the results of nine accuracy tests performed on the device on various days between January 4, 2018 and March 5, 2018.[15]  The results demonstrated that the device measured .003 percent higher than the expected value on two of nine tests; .002 percent higher than the expected value on one of the tests; .001 percent higher on three of the tests; and exactly at the expected value on three of the tests.[16]

At the hearing, Okorocha noted that the accuracy test performed nearest in time to Fail's February 3, 2018 arrest,[17] registered a result .002 percent higher than the expected value.  Okorocha testified that Fail's blood alcohol content would have been lower than .08 percent "if we account for the fact . . . that [the device] was reading high by a .001, .002."

After Okorocha testified, and over Fail's objection, the hearing officer continued the hearing to obtain testimony from a witness from the Department of Justice.[18]

---

[14]    The report identified the device by both model number ("Device Type") and serial number ("Device Serial").

[15]    As noted in part II.A, *ante*, Fail was arrested on February 3, 2018.

[16]    The device was tested by having the device measure a "gas value" of .100 percent of alcohol.  Thus, the expected value was ".100" percent for each of the tests, and the device measured between .100 and .103 percent.

[17]    The accuracy test to which Okorocha was referring was performed on February 6, 2018.

[18]    On appeal Fail states, "No grounds for a continuance existed and is [*sic*] the very reason why these hearings allowing HO's [hearing officers] to rule on their own motions and evidence is a fundamental due process violation."  However, Fail does not present any citation or reasoned argument

At the continued hearing, criminologist Jennifer Dernoncourt testified that when used in "evidential test mode," the device used to measure Fail's blood alcohol content reports blood alcohol content in "two digits," and it "truncates or cuts off the third digit."[19]  On cross-examination, Dernoncourt discussed the accuracy test results to which Okorocha had previously testified.  Dernoncourt explained that in "screening mode," the device used to measure Fail's blood alcohol content "is capable of going to the third digit." Dernoncourt agreed that, during an accuracy check on February 6, 2018, the device measured two one-hundredths of a percent higher than the expected value.  However, Dernoncourt explained that "[we] do not know," whether Fail's blood alcohol content was lower than .08 percent because "[i]t really would depend upon that third digit that's unknown."

ii.  *The trial court's statement of decision*

The trial court rejected Fail's contention that he was entitled to reversal of the suspension of his driver's license on the ground that the device used to measure his blood alcohol content was inaccurate.  The trial court reasoned:

---

in support of this assertion.  Thus, to the extent that Fail intends to claim that the hearing officer erred in continuing the hearing, we conclude that he has forfeited the argument.  (See, e.g., *Benach, supra,* 149 Cal.App.4th at p. 852 [issues that are not properly raised on appeal are forfeited].)

[19]  Stated differently, in evidential mode, the device reports blood alcohol content to the second decimal point, as in ".08."

Dernoncourt explained that such truncation is in accordance with California law, stating, "Title 17 has stated that you have to report to the two digits."  (See Cal. Code Regs., tit. 17, § 1220.4, subd. (b) ["Analytical results shall be reported to the second or third decimal place.  *When reporting to the second decimal place, the digit in the third decimal place shall be deleted*" (italics added).])

"[Fail] argues that the . . . device was reading slightly high on the [a]ccuracy [t]ests at the time of the stop, so the 0.08 [percent] really should have been considered a 0.07 [percent]. At hearing on the writ, [Fail] cited *Brenner* . . . for the idea that a device showing high in calibration tests means that the 0.08 [percent] reading is inaccurate, (*Brenner*[*, supra*,] 189 Cal.App.4th 365). However, in that case the records indicated that the machine was consistently reading higher than the true values tested and the [Department] did not present any evidence to rebut the argument. The appellate court was bound to uphold the trial court's decision if supported by substantial evidence. Here, the accuracy tests do not show the same consistent higher reading as in *Brenner*. The [a]ccuracy tests show that the device readings did fluctuate between .100 and .103 between 1/8/2018 and 3/5/2018, though the readings went up and down within that range. Also, the [Department] offered evidence of their own expert and the evidence given in the officer's report to rebut the conclusion that [Fail's blood alcohol content] was below 0.08 [percent]. The Supreme Court of California has overruled *Brenner*, stating[,] 'To the extent the court's statement in *Brenner . . . , supra*, 189 Cal.App.4th 365, . . . may be taken to preclude consideration of non-chemical-test evidence to bolster or corroborate chemical test results, we disapprove it.' (*Coffey*[*, supra*,] 60 Cal.4th [at p.] 1217). This court finds that the evidence in the record bolsters and corroborates the chemical test results showing [Fail's blood alcohol content] was 0.08 [percent]."

b. *Application*

Citing *Brenner, supra,* 189 Cal.App.4th 365, Fail argues that because the device used to measure his blood alcohol content was "reading high," it cannot be shown that his blood alcohol content was .08 percent or more. We are unpersuaded—chiefly because, as the trial court noted in its statement of

22

decision, in *Coffey*, the Supreme Court disapproved *Brenner* on a critical point relevant to Fail's claim.[20]

As discussed in part III.D.1.a, *ante*, in *Coffey* the Supreme Court held that circumstantial evidence of a defendant's intoxication is admissible in an administrative per se hearing to either "bolster the results of the chemical tests or . . . to rebut plaintiff's defense of a rising [blood alcohol content]." (*Coffey, supra*, 60 Cal.4th at p. 1216.) In reaching this conclusion, the *Coffey* court discussed *Brenner* and specifically disapproved that decision insofar as *Brenner* could be understood to preclude the consideration of non-chemical-test evidence to bolster or corroborate chemical test results:

> "*Brenner*[*, supra*, 189 Cal.App.4th 365], cited by plaintiff, does not warrant a contrary result. In that case, an expert examined the maintenance records for the device used to measure the driver's breath and opined that it produced slightly elevated results. As the driver's test results showed a [blood alcohol content] of 0.08 percent exactly, the expert opined the driver's actual [blood alcohol content] was slightly below the legal limit. Because the trial court in *Brenner* had *granted* the driver's petition for a writ, the Court of Appeal was required to uphold that decision if supported by substantial evidence. By contrast, the instant case comes to us in the opposite procedural posture: The trial court here *denied* relief to plaintiff and we are bound to uphold *that* decision if supported by substantial evidence. To the extent the appellate court in *Brenner* asserted that 'the impressions of the officer may have a bearing on plaintiff's level of impairment, [but] they have no bearing on the precise level of his [blood alcohol content]' (*id.* at p. 373), the statement must be read in the context of the case: Because the chemical tests in *Brenner* were done on a miscalibrated device used to measure the [blood

---

[20] In his briefing in this court, Fail did not discuss *Coffey* or acknowledge that the Supreme Court has disapproved *Brenner*, notwithstanding that the trial court expressly noted the disapproval of *Brenner* in its statement of decision.

alcohol content] in a breath sample, no accurate chemical test results were presented. No such problem exists in the instant case; the [Department] presented the results of four chemical tests and, although plaintiff's expert would have interpreted those results to conclude her [blood alcohol content] was rising, he did not testify they inaccurately measured her [blood alcohol content] at the time the tests were run. To the extent the court's statement in *Brenner*[, *supra*, 189 Cal.App.4th 365], may be taken to preclude consideration of non-chemical-test evidence to bolster or corroborate chemical test results, we disapprove it." (*Coffey, supra*, at pp. 1216–1217.)

In this case, as in *Coffey*, the trial court *denied* Fail's petition for writ of mandate and we are bound to uphold that decision if supported by substantial evidence. Further, under *Coffey*, the trial court could reasonably rely on evidence that corroborated Fail's two .08 percent blood alcohol content test results, including Officer Soltero's observations of Fail as having bloodshot, watery eyes and smelling of alcohol, Fail's admission to have consumed three or four beers, and Fail's poor performance on the field sobriety tests.

In addition, accuracy checks of the device used to measure Fail's breath showed only slightly elevated readings on some, but not all, of the checks. Further, as Dernoncourt explained, in accordance with California law, the device used to measure Fail's breath truncates the third decimal place when used in "evidential mode." Thus, even assuming that the device was providing slightly elevated results (i.e., .001 to .003 percent high) on the night in question, the trial court could reasonably reject Okorocha's implicit assumption that Fail's blood alcohol level was less than .082 percent such that the elevated reading would have falsely indicated that Fail was driving with a blood alcohol content of .08 percent or more.

In light of this evidence, the trial court could also reasonably reject Fail's contention that the alleged inaccuracy of the device used to measure his blood alcohol content demonstrated that his blood alcohol level was less than .08 percent.  Accordingly, we conclude that Fail is not entitled to reversal on the ground that the trial court erred in failing to find that the device used to measure Fail's blood alcohol content was inaccurate.

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.