Filed 11/21/25  P. v. Sheridan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C100716 |
| Plaintiff and Respondent, | (Super. Ct. No. 62188756) |
| v. | |
| CHRISTOPHER DAVID SHERIDAN, | |
| Defendant and Appellant. | |

After a jury found defendant Christopher David Sheridan guilty of possessing a controlled substance for sale, the trial court placed him on probation.  Defendant contends the conviction must be reversed for two reasons:  (1) the primary evidence in the trial was the fruit of an unlawful traffic stop and detention; and (2) the trial court abused its discretion by admitting overly prejudicial evidence of an uncharged offense. He also challenges a probation condition as an improper delegation of judicial authority.

1

We reject defendant's challenges to his conviction but agree that the probation condition is impermissibly vague. We remand for the trial court to strike or modify the condition and otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On November 15, 2022, the Folsom Police Department obtained a warrant to search defendant's car and home. In support of the warrant, a Folsom detective presented an affidavit relying on the following statement by a Folsom police officer (the officer).

On November 12, 2022, the officer was on patrol when he saw defendant driving while holding a cell phone in his hands with the screen illuminated. The officer stopped defendant under Vehicle Code section 23123 (section 23123). He asked defendant "not less than 3 times" about his residence, and defendant "refused to answer until . . . the 3rd time." Defendant refused to provide registration and insurance and "began to become frustrated that he had to talk with [the officer]." The officer believed defendant's "behavior to be nervous" and knew "suspects will become nervous and attempt to delay officers['] requests to prevent detection of possible weapons and contraband." He told defendant to turn the car off and give him the key. Defendant pulled away when the officer tried to grab the key and wouldn't let it go. The officer then asked defendant to interlace his fingers behind his head and get out of the car, but defendant refused. When asked if there were any weapons inside the car, defendant admitted there was a firearm in his backpack. The backpack was searched (the traffic stop search) and had inside a loaded revolver, two cell phones belonging to defendant, over $4,000 in cash, and four pill bottles for "Tank Jr." for 90 Xanax pills but contained over 400 unmarked pills in total with white powder flaking off. The officer believed that defendant was in possession of Xanax for sale and would possess additional illegal items at his home.

Law enforcement executed the warrant on November 15, 2022, searching defendant's home and his car located in front (the warrant search). Based on the evidence

found, defendant was charged in Placer County with possessing for sale alprazolam, a controlled substance. (Health & Safety Code, § 11375, subds. (b)(1), (c)(12).)

In August 2023, defendant filed a motion to suppress evidence, arguing that the traffic stop search occurred without a warrant (the first motion). On the date set for the hearing, there was a "joint request to reset" as well as a motion to continue that the court granted, but there is no reporter's transcript for the proceeding. Two days later, defendant filed a second motion to: (1) quash the warrant used to conduct the warrant search, (2) controvert the affidavit used as the basis for the warrant, and (3) suppress the evidence seized under the warrant. According to defendant's opening brief, the second motion was prompted by the prosecution providing a warrant for the home search. Citing *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*), the second motion argued that the affidavit underlying the warrant contained material misstatements and omissions and the remaining content failed to establish probable cause.

The prosecution filed an opposition to the second motion, arguing that defendant merely "quibbled" with the officer's descriptions but provided no evidence of material falsehoods or omissions. Also, in the prosecution's view, defendant's admission of an unsecured firearm in the car justified further search.

At the next hearing, defendant confirmed that the second motion revised the first and was the "paperwork to be considered." He also confirmed the hearing would consist of "argument only." Relying on the officer's body camera footage from the traffic stop search, defendant insisted there were numerous false statements in the supporting affidavit that went "toward the probable cause of the stop in the first place" and suggested the search conducted after the stop was unnecessary and unreasonable. He argued that "once those statements [were] taken out, there [was] no probable cause for the stop" and "no evidence to show that [defendant] was even on a phone at the time." As a result, the traffic stop search was unconstitutional and "everything afterwards should be dismissed as a fruit of the poisonous tree," including the warrant. He ended his argument as

3

follows: "There was no reason to unreasonably detain [defendant] based off false information. And thus, the warrant should be traversed and the language should be changed, the search warrant that was based off that should be quashed, and the evidence should be suppressed."

In opposition, the prosecution argued that defendant did not make a substantial showing to justify a *Franks* hearing because none of the identified statements were materially false. In his view, the officer's impressions were simply different than defendant's.

The trial court received the body camera footage and transcript into evidence. According to that footage, the traffic stop occurs at night. The officer walks up to defendant's car, shines a flashlight on the driver's side, knocks on the driver's window, and tells defendant he was stopped because he was "on [his] phone." The officer then asks for defendant's driver's license, which defendant provides a few seconds later. The officer asks if defendant still lives in Lincoln. Defendant responds but the response is inaudible, and the officer then asks defendant if still "live[s] in Lincoln though," emphasizing the word "lives." At this point in the footage, defendant is not visible. Defendant appears to say "umm, yes," and the officer asks, "is that a yes or a no, you seem a little hesitant?" Defendant responds, "yes." The officer then asks for license and registration, and defendant confirms he has "all that stuff." The officer asks, "Can I have it please?" The officer then shines his flashlight into the car for a few seconds, showing defendant holding an open wallet. The officer lowers the flashlight, reflecting light on one of defendant's hands, and asks, "Is everything ok?" Defendant responds, "I'm all good bro, I'm just complying with everything you're asking." The officer moves the flashlight to the officer's other hand and asks, ". . . did I do something or--" Defendant gestures toward the glove box and says, "[inaudible], I gotta unbuckle, I gotta go in the glovebox, you have two officers on me, you guys have your hands on your weapon." Only defendant's hand gestures are visible in the footage at this point. The officer

4

interjects, "My hand's in my pocket." Defendant responds, "Alright, [inaudible] just checking, I can't see—." Then the officer says, "OK, hey man, let's start over ok. The reason I pulled you over is because you were on your phone. I've already identified that, ok. I've been very nice to you. I just asked for ID. I need your, your legally— Alright, turn the car off for me dude." The officer shines the light directly in the car and says, "give me the keys, give me the keys" Defendant pulls the key out of the ignition and the officer put his hand inside the window. The camera is now pointed parallel to the car. When the camera turns back, we see both defendant and the officer holding the key and hear defendant say, "wait, wait" and the officer say, "give me -- ok, nope, we're not doing this, nope. Put your hands on your head dude. Interlace your fingers behind your head."

After taking the matter under submission, the court denied the second motion in September 2023, finding insufficient evidence of materially false statements needed to trigger a *Franks* hearing.

During the jury trial held in October and November 2023,[1] the Folsom detective testified regarding the evidence found in the warrant search. He and his team found loaded firearms in a dresser next to a bed, a plastic bag filled with empty prescription bottles in the living room, and a large amount of marijuana. After defendant refused to provide access to a gun safe located in his room, the fire department sawed it open. In the safe, the Folsom detective and his team found two shotguns, a large amount of ammunition, over 300 unmarked alprazolam pills in three or four pill containers, and over $4,000 in cash in a smaller safe. And in the center console of defendant's vehicle parked at the home, they found about $20,000 in cash bundled in rubber bands.

The Folsom detective testified that (1) alprazolam sold on the street is commonly in the form of white, unmarked pills with three "squares" on them, representing four

---

[1] This was the second jury trial. The first occurred in September 2023 and ended in a mistrial.

5

doses; (2) unmarked pills raise a suspicion of illegal narcotic sales; and (3) it is common for drug dealers to place the substances they are selling in prescription bottles and to carry large amounts of cash and firearms on their person and in their homes.

A criminalist conducted representative sample testing for the pills collected at the traffic stop search and the warrant search and confirmed they were alprazolam. According to a narcotics detective expert, alprazolam is the generic version of Xanax.

Defendant's fiancé testified that the cash found in the warrant search was hers, explaining that her employment compensated her in cash, she could potentially make $1,000 a day, and she didn't put all the cash she earned in the bank. She owned firearms to protect herself and her money, and defendant had two phones because she gave him one, but it was "kind of glitching," and he ended up buying a new one. According to fiancé, defendant owned two dogs. Both were called Tank, Jr. as their "bloodline name" and both were aggressive. Fiancé saw prescription bottles with Tank, Jr.'s name on them and gave both dogs one pill of alprazolam three times a day to calm them.

Defendant also presented evidence that three veterinarians prescribed alprazolam for "Tank" for anxiety between February 29, 2020 and July 20, 2021.

On November 13, 2023, the jury found defendant guilty of the charged offense. After considering the probation report, the sentencing briefs, and three letters, the trial court placed defendant on probation and selected certain probation conditions from the court's standardized order. The selected conditions required defendant to: (1) abstain from use or possession of intoxicants or marijuana; (2) not be in any place where alcohol or marijuana is the primary item of sale; (3) abstain from use or possession of narcotics, controlled substances, or drug paraphernalia without a valid medical prescription; (4) submit to drug, narcotic, and alcohol testing as directed by the probation officer; (5) seek and maintain gainful employment; (6) not annoy, harass, or contact any prosecution witnesses to the crime or who testified at trial; (7) stay away from a particular veterinarian's place of work, home, or vehicle; and (8) "enter into and continue

6

such education, psychological, psychiatric, drug, alcohol, or other rehabilitation program as directed by the probation officer or as specifically ordered as a term of probation, and shall not leave or terminate such programs without the permission of the probation officer" (the program condition).

Defendant timely appeals.

## DISCUSSION

### I

### *Traffic Stop and Detention*

Defendant contends the evidence from the warrant search was the fruit of an unlawful traffic stop and prolonged detention. The People contend defendant forfeited this contention by failing to assert it in the trial court. We agree with the People.

A.     Forfeiture

" '[W]hen defendants move to suppress evidence under [Penal Code] section 1538.5, they must inform the prosecution and the court of the specific basis for their motion.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 235.) "[I]f defendants detect a critical gap in the prosecution's proof or a flaw in its legal analysis, they must object on that basis to admission of the evidence or risk forfeiting the issue on appeal." (*People v. Williams* (1999) 20 Cal.4th 119, 130.) For example, "if defendants have a specific argument *other than the lack of a warrant* as to why a warrantless search or seizure was unreasonable, they must specify that argument as part of their motion to suppress [evidence] and give the prosecution an opportunity to offer evidence on the point." (*Ibid*.) "The determinative inquiry in all cases is whether the party opposing the motion had fair notice of the moving party's argument and fair opportunity to present responsive evidence." (*Id*. at p. 135.)

Here, the first motion challenged the traffic stop search on the basis that it occurred without a warrant. Defendant then revised that motion with the second motion and confirmed that the second motion was the only motion at issue. The second motion

did not challenge the traffic stop. Instead, it sought to traverse the affidavit underlying the search warrant, citing *Franks, supra*, 438 U.S. 154 and arguing that several of the officer's affidavit statements were false and made deliberately or with reckless disregard for the truth. As so presented, the revised motion required the trial court to determine whether defendant had made a "substantial preliminary showing" of false statements that were necessary to a finding of probable cause. (*Franks*, at pp. 155-156.) If defendant had made that showing, he would have been entitled to an evidentiary hearing to test the veracity of the affidavit. (*Ibid.*) But the trial court found that defendant failed to make the necessary showing, and defendant does not challenge that finding on appeal.

Instead, defendant contends the traffic stop and detention were unlawful based on an unreasonable mistake of law and unreasonable, prolonged, and overbroad detention. Such a contention would have required the trial court to conduct an evidentiary hearing (see Pen. Code, § 1538.5, subd. (c)(1)), but defendant affirmed he was offering argument only. Although he proceeded to orally argue that the traffic stop and detention were unlawful, the People were not given advance notice of the specific basis of those arguments or a fair opportunity to present responsive evidence. (*Williams, supra*, 20 Cal.4th at p. 129 [defendants must precisely pinpoint the subject matter of the proof].) Indeed, the trial court never ruled on the propriety of the stop and detention, and defendant did not insist on a ruling. In these circumstances, we concluded defendant forfeited his challenges to the traffic stop and detention.

B.      Ineffective Assistance

Anticipating our forfeiture conclusion, defendant contends his trial counsel was ineffective by failing to proceed with a challenge to the traffic stop and detention. We disagree.

To establish ineffective assistance of counsel, defendant must establish two elements: (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms; and (2) the

8

deficiency resulted in prejudice to the defendant. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) If defendant makes an insufficient showing on either element, his ineffective assistance claim fails. (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

In support of both elements, defendant requests us to take judicial notice of a separate case filed in Sacramento County that charged defendant with the same offense based on the evidence collected at the traffic stop search (the Sacramento case). Specifically, he seeks judicial notice of the following documents from the Sacramento case: (1) the complaint, (2) the reporter's transcript of the July 2024 hearing granting defendant's motion to suppress evidence, and (3) the court's order dismissing the case. He argues these documents show there was no satisfactory explanation for trial counsel's failure to make the same motion in this case and that failure caused prejudice.

We grant defendant's request for judicial notice in part and deny it in part. A court is free to take judicial notice of the existence of each document in a court file, including the existence of a trial court's factual findings. (*Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 147.) Applying that principal here, we take judicial notice of the existence of the identified documents from the Sacramento case and the fact that defendant successfully moved to suppress the evidence from the traffic stop search in that case. But defendant also asks us to expand judicial notice and accept the findings from the Sacramento case as indisputably true, thereby showing that the same motion in this case would have been granted. (See *People v. Caro* (2019) 7 Cal.5th 463, 488 [where a defendant claims ineffective assistance based on counsel's failure to litigate a Fourth Amendment claim, the prejudice prong requires the defendant to prove that the claim is meritorious].) This is not a proper use of judicial notice. (*Kilroy v. State of California*, at pp. 147-148 [a court may not accept as indisputably true a factual finding made after a contested adversary hearing except where the finding is relevant for purposes of res judicata, collateral estoppel, or law of the case]; see *Professional Engineers v.*

9

*Department of Transportation* (1997) 15 Cal.4th 543, 590.) In this regard, defendant's request for judicial notice of the Sacramento case documents is denied.[2]

Citing Code of Civil Procedure section 909 and California Rules of Court, Rule 8.252, defendant also asks us to take judicial notice of and make determinations of fact based on the following documents: (1) the motion to suppress testimony offered in the Sacramento case and (2) trial counsel's declaration that at the time of the first and second motions, he was unaware of case law supporting a motion to suppress the traffic stop evidence, including *People v. Spriggs* (2014) 224 Cal.App.4th 150, that "held that holding a cell phone with an illuminated screen while driving does not violate . . . section 23123."

Defendant again requests more than we can grant. Although the power to make factual determinations on appeal lies within a reviewing court's discretion (*Diaz v. Professional Community Management, Inc.* (2017) 16 Cal.App.5th 1190, 1213), that power will be exercised only to enable the appellate court to affirm the judgment, not lead to a reversal. (*Estate of Schluttig* (1950) 36 Cal.2d 416, 422.) This power is also exercised rarely and only in "exceptional circumstances." (*Charisma R. v. Kristina S.* (2006) 140 Cal.App.4th 301, 308.) Those circumstances are not present in the context of defendant's ineffective assistance claim. When such a claim is raised on direct appeal, the trial record must affirmatively establish the deficiency of trial counsel's representation. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) But here, defendant relies on evidence outside the trial record that we cannot consider on direct appeal. (*People v. Waidla* (2000) 22 Cal.4th 690, 703, fn. 1.) Defendant's claim is more properly addressed in a habeas corpus proceeding that can extend to matters outside the record. (*Ibid*.) For these reasons, defendant's request for judicial notice and determinations of fact is denied.

---

[2] Because we limit judicial notice to the existence of these documents, we deny the People's request to file supplemental briefing.

Based on the record properly before us for consideration, defendant does not convince us that trial counsel's representation fell below an objective standard of reasonableness. We review trial counsel's performance with deferential scrutiny, indulging a strong presumption that his conduct fell within the wide range of reasonable professional assistance and recognizing the many choices that attorneys make in handling cases and the danger of second-guessing an attorney's decisions. (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) Based on that deference, "we will not find ineffective assistance of counsel on appeal unless there could be *no* conceivable reason for counsel's . . . omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926 [emphasis added].) Here, the four corners of the trial record combined with the judicially noticed records do not establish ineffective assistance. (See *Waidla, supra*, 22 Cal.4th at p. 703, fn. 1 [appeal is limited to the four corners of the record on appeal].)

To satisfy the Fourth Amendment, "a detention must be supported by reasonable suspicion the person is involved in criminal activity." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 56.) Reasonable suspicion means " ' "the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." ' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1053-1054.) If the detaining officer's justification for the stop is based on a mistake – either factual or legal – then the resulting search or seizure is still lawful under the Fourth Amendment as long as the officer's mistake is objectively reasonable. (*Heien v. North Carolina* (2014) 574 U.S. 54, 60.) "To be reasonable is not to be perfect, . . . so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.' " (*Id.* at pp. 60-61.)

Here, trial counsel could have reasonably concluded that the prosecution would have offered persuasive evidence and arguments in opposition to a motion to suppress the traffic stop evidence. (See *People v. Freeman* (1994) 8 Cal.4th 450, 509 ["competent

11

counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances"].)  The record does not indicate trial counsel knew how the officer would testify at a motion to suppress hearing (see *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267), including how he would describe the moments in the body camera footage when defendant is not visible or his responses are inaudible.  Also, we cannot assume the officer would testify in precisely the same way he testified over nine months later in the Sacramento case, nor can we assume a different trial court would have made the same findings.  (See *People v. Brown* (2015) 61 Cal.4th 968, 975 [when reviewing a trial court's decision on a motion to suppress, the reviewing court must "defer to its factual findings if supported by substantial evidence"]; *People v. Suff, supra*, 58 Cal.4th at pp. 1053-1054 [reasonableness of detention depends on totality of circumstances].)

We also presume trial counsel knew of the following principles:  (1) a "traffic stop is lawful at its inception if it is based on a reasonable suspicion that *any* traffic violation has occurred" (*Brierton v. Department of Motor Vehicles* (2005) 130 Cal.App.4th 499, 510); and (2) "an officer's reliance on the wrong statute does not render his actions unlawful if there is a right statute that applies to the defendant's conduct" (*In re Justin K.* (2002) 98 Cal.App.4th 695, 700).  (See *People v. Barrett* (2012) 54 Cal.4th 1081, 1105 [counsel is presumed competent and informed as to applicable law].)  Based on that knowledge, trial counsel could have predicted that the prosecution would persuasively argue that the officer intended to cite defendant for violating Vehicle Code section 23123.5 (section 23123.5), the statute that immediately follows section 23123, the statute the officer did cite.  (Compare *Spriggs, supra*, 224 Cal.App.4th 150, 156 [section 23123 only prohibits listening and talking on a cell phone unless the phone is used in hands-free mode] with *People v. Porter* (2025) 111 Cal.App.5th 927, 934 [section 23123.5 "prohibits all use of a handheld phone's functions while driving"].)

In a supplemental brief, defendant addresses the impact of *Porter*. Specifically, he cites the *Porter* court's clarification that a driver can still hold a phone "that is turned off or is turned 'on' but has the screen locked so applications and notifications are inaccessible by the driver." (*Porter, supra*, 111 Cal.App.5th at p. 944.) In defendant's view, this clarification shows there is (1) no way the officer could have had a reasonable suspicion that defendant committed a traffic infraction and (2) no reason why competent trial counsel would not object to the evidence collected from the stop.

We are unpersuaded by defendant's supplemental brief. The body camera from the traffic stop indicates the officer saw defendant driving while "on" his phone, and we cannot say this behavior clearly falls outside section 23123.5 under *Porter* or rendered the stop improper given the principle that a "traffic stop is lawful at its inception if it is based on a reasonable suspicion that *any* traffic violation has occurred." (*Brierton, supra*, 130 Cal.App.4th at p. 510). Moreover, the suppression motions were filed in 2023, well before *Porter* was decided, but after section 23123.5 was enacted with language "susceptible to more than one reasonable interpretation," as *Porter* explains, and an intent to "mitigate issues that arose after" *Spriggs*. (*Porter, supra*, 111 Cal.App.5th at p. 935; Assem. Com. On Transportation, Analysis of Assem. Bill No. 1785 (2015-2016 Reg. Sess.) as amended Apr. 5, 2016, pp. 2-3.)

Based on those considerations, trial counsel could have reasonably concluded that an attack on the traffic stop search "would not be successful, and therefore could have decided to focus . . . [on] the argument that the warrant affidavit contained intentionally or recklessly false statements." (*People v. Diaz* (1992) 3 Cal.4th 495, 563.)

## II

### *Admission of 2016 Evidence*

A.    Additional Background

The prosecution moved to admit evidence of a 2016 search of defendant's home in which police found 88 alprazolam pills, over $19,000 in cash, and hundreds of pills

resembling alprazolam dissolving in the toilet (the 2016 evidence). In support, the prosecution argued this evidence provided circumstantial evidence of defendant's intent as to the charged offense. Defendant objected on various grounds, including that the 2016 evidence was dissimilar and violated Evidence Code section 352.

The court granted the prosecution's motion, concluding the 2016 evidence was "relevant and highly probative as to both intent and lack of mistake" and "[t]he cases [were] quite similar in nature given the type of drug at issue, the large amount of cash found and the fact [that the] items were found at . . . defendant's home on both occasions." After analyzing the evidence under Evidence Code section 352, the court found the probative value was not substantially outweighed by a risk of undue prejudice, noting that the 2016 evidence was not remote, would not occupy a significant amount of time, and would not confuse the jury.

During the trial, a Placer County detective testified that he helped with a residential search warrant at defendant's home in 2016. He and his team had to force open an outer gate and the front door. After entering, the Placer detective saw defendant walking out of a bathroom. The Placer detective searched the bathroom and found "between 200 to 300" pills "dumped into the toilet." The jury saw a picture of the dissolving pills. Elsewhere in the home, the team found 88 similar-looking pills, multiple firearms, and over $19,000 in cash. The Placer detective testified that illicit narcotic sales is a cash-based business and that "drug dealers will have firearms . . . in easy reach of wherever they're staying."

The court later instructed the jury regarding the 2016 evidence: if the prosecution proved by a preponderance of the evidence that defendant had committed the prior uncharged act, then the jury could consider the evidence for the limited purpose of deciding whether defendant acted with intent to possess alprazolam for sale as to the charged conduct and whether defendant's actions as to the charged conduct were the result of mistake or accident.

14

In closing argument, the prosecution argued that drug dealers flush illegal drugs when police arrive because the drugs dissolve: "that's why drug dealers do it, and that's why [defendant] did it in 2016." The prosecution urged that defendant's 2016 conduct gave the jury "an insight into [defendant's] intent [in] this case."

Defense counsel countered that there was "no actual evidence presented" regarding the 2016 conduct: "[a]ll we had [were] white things in the toilet. That's all we had. Everything else – nothing was tested. It did not match. . . . It's more likely than not that he had no intent that day and there's not enough evidence to support anything in that case."

B.     Analysis

Evidence Code section 1101, subdivision (b) makes evidence of uncharged crimes admissible when relevant to demonstrate a fact other than disposition to commit a crime, such as intent, knowledge, and absence of mistake or accident. Here, defendant does not dispute the relevance of the 2016 evidence but contends it was unduly prejudicial under Evidence Code section 352. We disagree.

Before admitting evidence of uncharged crimes, the trial court must weigh the probative value of the evidence against its potential to create substantial risk of undue prejudice. (*People v. Rogers* (2013) 57 Cal.4th 296, 326; Evid. Code, § 352.) We review the trial court's ruling for abuse of discretion and do not disturb the ruling "unless it was arbitrary, capricious, or made in a ' "patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 358.) Here, the trial court acted within its discretion.

The factors weighed under Evidence Code section 352 include the degree of similarity between the uncharged act and the charged offense, the remoteness of the uncharged act, whether the uncharged act is particularly inflammatory relative to the charged offense, whether the uncharged evidence emanates from a source independent of the charged evidence, the possibility of confusion of issues, and consumption of time.

15

(*People v. Tran* (2011) 51 Cal.4th 1040, 1047; *People v. Robinson* (2024) 99 Cal.App.5th 1345, 1352.)  Defendant focuses on two of these factors:  the inflammatory nature of the 2016 evidence and the possibility of confusion of issues.  Specifically, he contends the 2016 evidence was more inflammatory than the charged conduct because it suggested defendant destroyed evidence and refused to cooperate with law enforcement.  And he contends the 2016 evidence increased the risk of confusion because (1) the jury did not hear whether defendant sustained a conviction for the acts covered by the 2016 evidence; (2) the defense that defendant raised in this case also arguably applied to the 2016 evidence; (3) the pills found dissolving in the toilet in 2016 were never chemically identified; and (4) there was no conclusive evidence that defendant intended to sell the flushed pills.

We are not persuaded by defendant's contentions for three reasons.  First, defendant overstates the inflammatory nature of the 2016 evidence compared to the warrant search evidence.  Defendant was not particularly cooperative with the November 15, 2022 warrant search.  He refused to provide access to a gun safe in his room, prompting law enforcement to seek the help of the fire department to gain access.  Second, the evidence that defendant was flushing pills in 2016 was highly probative of his knowledge of the illicit nature of the pills, regardless of whether they were alprazolam or another controlled substance.  (See *People v. Meza* (1995) 38 Cal.App.4th 1741, 1745-1746 [unlawful possession of controlled substance for sale requires proof of possession with intent to sell and knowledge of the substance's presence and illegal character].)  And third, when combined with the evidence of weapons and large sums of cash, the evidence was also highly probative of his intent regarding the pills.  (See *ibid*.)

We also reject defendant's suggestion that the 2016 evidence needed to provide "conclusive evidence" of an intent to sell to avoid confusing the jury.  The case on which defendant relies required "sufficient evidence," not conclusive evidence, of a "culpable . . . act and points of similarity tending . . . to establish a culpable mental state [or negate

a defense] in the charged offense." (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1162.) As covered, the 2016 evidence was probative of defendant's knowledge and intent and included multiple points of similarity with the evidence of the charged offense, including a significant amount of cash, multiple guns, and large quantities of pills found in defendant's home. Because we reject defendant's contention regarding the inflammatory nature of the 2016 evidence, we also reject his contention that the jury was more likely to punish him for the 2016 acts. It's unlikely "the jury's passions were inflamed by the evidence of defendant's uncharged offenses" because "the [evidence] describing defendant's uncharged acts . . . was . . . no more inflammatory than the [evidence] concerning the charged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

In sum, defendant overlooks the balance of factors a court must consider under Evidence Code sections 1101 and 352. (See *People v. Christensen* (2014) 229 Cal.App.4th 781, 799 [uncharged evidence not so severe that it should excluded without a consideration of other factors].) He also overlooks that the court provided a limiting instruction on the purpose for which the jury could use the 2016 evidence. Such an instruction mitigates the possibility of undue prejudice. (*People v. Thomas* (2023) 14 Cal.5th 327, 363.) Considering the totality of the circumstances, the trial court acted within its discretion in admitting the 2016 evidence.

III

*Validity of Program Condition*

Defendant contends the program condition of his probation must be stricken because it constitutes an improper delegation of judicial authority. Specifically, he contends the condition is invalid in three ways. Applying de novo review, we address each challenge separately. (*People v. Smith* (2022) 79 Cal.App.5th 897, 902.)

First, relying on *Smith*, defendant contends the probation condition gives probation the discretion to require him to attend residential treatment as opposed to outpatient

17

treatment.  We disagree because *Smith* is distinguishable.  In *Smith*, the defendant was given two years of supervised probation.  (*Smith, supra*, 79 Cal.App.5th at p. 900.)  The trial court imposed substance abuse-related probation conditions, including the condition that the defendant "participate in any treatment/therapy/counseling program, including residential [treatment], as directed by the probation officer."  (*Id*. at p. 901.)  The reviewing court concluded that "treatment/therapy/counseling . . . including residential treatment" improperly delegated to probation the discretion to decide whether the defendant needed to attend *residential* treatment as opposed to outpatient treatment.  (*Ibid*.)  The court remanded for the trial court to either "strike the words 'including residential' " or specify that the court was requiring residential treatment.  (*Id*. at p. 905.)  Here, the program condition does not expressly identify residential treatment as a possibility, so we elect to construe the condition to eliminate the possibility of residential treatment.  (See *United States v. Mike* (10th Cir. 2021) 632 F.3d 686, 696 [courts will construe non-specific, all-encompassing conditions in a manner that does not make them infirm]; see *People v. Hall* (2017) 2 Cal.5th 494, 501 [reviewing court will not invalidate a probation condition as unconstitutionally vague if a reasonable and practical construction can be given to the language].)

Second, defendant contends the program condition permits probation to dictate the strenuousness of probation compliance.  We disagree.  *People v. Penoli* (1996) 46 Cal.App.4th 298 is instructive.  There, the reviewing court rejected a similar contention.  (*Id*. at pp. 308-309.)  We agree with that court's reasoning:  "Should the probation officer make a determination favorable to defendant, defendant will suffer no legal injury.  An unfavorable determination, on the other hand, will be inherently subject to judicial review.  That is, if the probation officer concludes that the defendant has not successfully completed the program, he or she must bring the matter to the court's attention by petition to revoke, extend, or modify probation.  (See [Pen. Code,] § 1203.2, subd. (a).)  . . .  If proceedings are instituted, the defendant may challenge the probation

officer's interpretation of the facts." (*Penoli,* at p. 309, italics omitted.) We also presume a probation officer will not interpret a probation condition arbitrary or irrationally; if a probation officer acts contrary to that presumption, the defendant can file a petition for modification of the condition. (*People v. Arevalo* (2018) 19 Cal.App.5th 652, 658.) In short, the "ultimate determination of compliance must necessarily be made by the court, at which time any undue deference to the probation officer's opinion may be challenged and, if necessary, appealed." (*Penoli*, at p. 310.)

And third, defendant contends the program condition does not "illuminate[] for [defendant] the nature and extent of psychiatric, psychological, or educational programs the court deemed appropriate." As to the extent of the program, we disagree. Defendant fails to sufficiently explain what he means by the term extent, and we do not develop arguments his behalf. (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.) But we do agree with defendant that the nature of the required program is impermissibly vague. "[I]t is the court's duty to determine the nature of the requirements imposed on the probationer." (*Smith, supra*, 79 Cal.App.5th at p. 902.) Although a probation condition need not be set forth with " 'mathematical certainty,' the language used must have ' "*reasonable* specificity." ' " (*Sheena K.* (2007) 40 Cal.4th 875, 890.) Here, such specificity is lacking. The program choices for the probation officer are open-ended, ranging from education to psychological and psychiatric to drug, alcohol, or other rehabilitation. This is too vague to pass muster, and the People do not suggest we can interpret it more narrowly in light of other probation conditions, the probation report, or the trial court's commentary. (See *Smith*. at pp. 902-903 [reviewing court can consider context and trial court's comments to determine whether a condition is unconstitutionally vague].) Without meaningful guidance from the record, the open-ended program condition cannot be "saved by permitting the probation department to provide the necessary specificity." (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1358.) We

19

remand for the trial court to either strike this condition or specify the type of program to which defendant may be subject.

DISPOSITION

The matter is remanded for the trial court to either (1) strike the program condition or (2) modify the condition to specify the type of program to which defendant may be subject. The judgment is otherwise affirmed.


                                                          /s/
                                                         MESIWALA, J.


We concur:


 /s/
HULL, Acting P. J.


 /s/
DUARTE, J.

20